Newell, J., delivered the unanimous opinion of the Court.
Appellant, Ernesto Lerma, was charged with possession of four grams or more, but less than 200 grams, of cocaine. After the trial court denied Appellant's motion to suppress the cocaine, he pleaded guilty. The court of appeals reversed, holding that the officer's frisk of Appellant, made during an unjustifiably prolonged traffic stop, was not supported by reasonable suspicion. We disagree. We hold that the initial frisk was supported by reasonable suspicion and the original stop was not unduly prolonged. We will reverse the court of appeals.
Background
The only witness to testify at the suppression hearing was police officer Javier *187 Salinas, Jr. On the evening of November 2, 2014, Salinas was conducting a patrol of the streets of Corpus Christi. At 10:55 p.m. Salinas stopped a vehicle for failing to stop behind the line at a stop light and failing to use a turn signal at least 100 feet prior to the intersection. The traffic stop was recorded by a video camera; the stop lasted nine minutes from the time of the stop to the moment Appellant fled the scene on foot.
After pulling the vehicle over, Salinas approached the driver's side of the car. There were four occupants in the car: the driver, Appellant, who was in the front passenger seat, and a woman with an unrestrained baby on her lap in the back seat.[1] Salinas asked the driver for his driver's license and insurance information, whether there were any weapons in the car, where the occupants were headed, and where they were coming from.
Salinas also asked Appellant whether he had any identification. Appellant replied that he did not have any identification on him. During this initial interaction Salinas observed Appellant moving his feet a lot, trying to reach his hands into his pockets, and moving his hands between the seats. Appellant appeared nervous and unsure of himself. These movements caused Salines to move to the passenger side of the vehicle to make sure that Appellant was not trying to grab a weapon. While Salinas was on the passenger side of the vehicle, the driver handed Salinas his driver's license and insurance paperwork. Salinas reviewed the insurance paperwork and gave it back to the driver, but kept the driver's license so he could later determine whether the driver had any outstanding warrants. Salinas also planned to check for warrants for the passengers and investigate the circumstances surrounding the unrestrained child in the vehicle. At this point, Salinas had determined that he would likely issue a warning to the driver if he remained cooperative, though he did not issue either a warning or a traffic citation at that time.
Salinas again asked Appellant if he had any identification. Again, Appellant said he did not. Salinas also asked Appellant why he was so nervous. Pursuant to his typical course of conduct, Salinas asked Appellant to exit the vehicle so he could make a proper identification of Appellant.[2] Appellant hesitated and Salinas asked, "Is there a reason you don't want to come out or something?" Appellant then exited the car.
Salinas informed Appellant that he was going to conduct a pat-down and Appellant stated that he had a pocket knife.[3] Salinas *188 retrieved the pocket knife, put it on the front passenger seat, and continued the pat-down. As Salinas patted Appellant down, Appellant "seemed to be guarding his pocket areas, trying to reach into his pockets." Salinas "felt what was consistent with cigars and a bag of some sort of soft substance inside," but Salinas did not retrieve those items from Appellant's pockets. Salinas explained that a pack of cigars was consistent with what police commonly see used to roll marijuana. Although he testified that he could not identify any particular drugs in Appellant's pockets based on the pat-down, Salinas believed that Appellant "had some sort of narcotics or some sort of illegal substance" on him. Salinas did not confront Appellant at that time, however, because Salinas was still alone, outnumbered, and Appellant was acting nervous.[4] Having removed Appellant's pocket-knife, Salinas did not feel any additional weapons during the pat-down.
Salinas then asked Appellant for his name and birth date. Appellant replied that his name was "Bobby Diaz" and his birth date was September 22, 1984.[5] Salinas asked Appellant when he was last arrested and Appellant replied "months ago." Salinas asked Appellant about the woman in the back seat of the vehicle and Appellant said the woman was the driver's girlfriend.
Another officer arrived on the scene at 10:59 p.m., four minutes after the initial stop. Salinas asked Appellant whether he had any weapons or anything illegal on his person and Appellant said that he did not. Salinas then asked "You okay if I check your pockets to make sure you don't got nothing on you?" Appellant replied "I'd rather you didn't." Salinas then asked Appellant for his name and birth date again; Appellant said Bobby Diaz, September 22, 1984. Salinas instructed Appellant to "chill out" and sit on the curb.
Salinas then went back to his patrol unit and ran the personal information Appellant had given him. At 11:00 p.m., five minutes after the initial stop, Salinas determined that Appellant did not match the physical description of the "Bobby Diaz," with a birth date of September 22, 1984, that he had obtained from his computer.[6] Salinas then returned to Appellant and asked where he was from and when he had last "smoked weed." Appellant replied that it was "a while ago." Salinas told Appellant that he could smell marijuana on him. Appellant then admitted that he had smoked synthetic marijuana that day and that he had some on him. At 11:04 p.m., Salinas searched Appellant's pockets and found synthetic marijuana, at which point Appellant took off running. The officers chased Appellant and caught him about 15 seconds later.
After Appellant was arrested, he told Salinas that he was a habitual offender, "looking at 25 to life." Appellant admitted to the officers that he had a lot of crack on him, had a warrant for his arrest, and had lied about his name. The officers searched Appellant and recovered a bag of synthetic *189 marijuana and a "Tupperware bowl" containing 17 crack cocaine rocks. Appellant indicated that there was more cocaine in the vehicle. Salinas searched the vehicle, but did not find any more cocaine. After searching the vehicle, Salinas reinitiated contact with the driver and female passenger. The woman's friend brought a car seat to the scene for the unrestrained child and Salinas terminated the traffic stop without issuing a citation to the driver. The trial court denied Appellant's motion to suppress without making findings of fact.
Court of Appeals
Applying our decision in St. George v. State,[7] the court of appeals found that Officer Salinas did not have reasonable suspicion to justify conducting a Terry frisk of Appellant or to prolong the traffic stop.[8] The court of appeals acknowledged that upon observing a traffic violation, Salinas was entitled to stop the vehicle, request the driver's license and insurance information from the driver, and conduct a computer check on that information.[9] But the court of appeals held that Salinas did not have reasonable suspicion to investigate Appellant, the passenger of the vehicle.[10]
The court identified only three articulable facts it believed Salinas had knowledge of when he conducted the initial pat-down: (1) Appellant was a passenger in a vehicle that had just been stopped for two minor traffic infractions; (2) Appellant was "moving around on his feet a lot, trying to reach into his pocket," and was reaching in between the seats of the car; and (3) Appellant had no identification on him.[11] The court found that these facts, when combined with rational inferences therefrom, could not reasonably lead to the conclusion that Appellant possessed a weapon, to justify the Terry frisk, or that Appellant was, or soon would be, engaged in criminal activity, to justify prolonging the traffic stop.[12]
The court noted that, as in St. George , although Appellant gave false identifying information, Salinas did not know the information was false at the time he performed the initial pat-down. The court dismissed the State's argument that St. George was distinguishable because in this case the investigation of the traffic stop had not concluded at the time of the pat-down, stating "that [Salinas] had already completed his investigation as to 'the reason that [the driver] was stopped.' "[13] Having found that the pat-down and prolonged stop were not supported by reasonable suspicion, the court of appeals held that the trial court erred in denying Appellant's motion to suppress.[14]
Standard of Review
We review a trial court's ruling on a motion to suppress evidence under a *190 bifurcated standard of review.[15] At a motion to suppress hearing, the trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony.[16] Therefore, we afford almost complete deference to the trial court in determining historical facts.[17] However, we review de novo whether the facts are sufficient to give rise to reasonable suspicion in a case.[18]
When the trial court does not make explicit findings of fact, as in the case before us, we view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record.[19] We will sustain the ruling of the trial court if it is correct under any applicable theory of law.[20]
Discussion
The Fourth Amendment prohibits unreasonable searches and seizures. A stop and frisk by law enforcement implicates the Fourth Amendment's protections.[21] This is true whether the person detained is a pedestrian or the occupant of an automobile.[22] A Fourth Amendment analysis regarding an officer's stop and frisk has two prongs.[23] A court must first decide whether the officer's action was justified at its inception.[24] Next, a court must decide whether the search and seizure were reasonably related in scope to the circumstances that justified the stop in the first place.[25]
In the context of a traffic stop, police officers are justified in stopping a vehicle when the officers have reasonable suspicion to believe that a traffic violation has occurred.[26] A traffic stop made for the purpose of investigating a traffic violation must be reasonably related to that purpose and may not be prolonged beyond the time to complete the tasks associated with the traffic stop.[27] During a traffic stop the officer may request certain information from a driver, such as the driver's license, vehicle registration, and proof of insurance, and run a computer check on that information.[28] An officer is also permitted to ask drivers and passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop.[29]
There is no per se rule that an officer must immediately conduct a computer *191 check on the driver's information before questioning the occupants of the vehicle.[30] Once the computer check is completed, and the officer knows that the driver has a current valid license, no outstanding warrants, and the car is not stolen, the traffic stop investigation is fully resolved.[31] However, if an officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity the officer may continue questioning the individual regardless of whether the official tasks of a traffic stop have come to an end.[32]
During the course of a detention, an officer may, in certain circumstances, conduct a pat-down search of an individual to determine whether the person is carrying a weapon.[33] In order to justify a pat-down, the officer must reasonably believe that the suspect is armed and dangerous, such that the officer can point to specific and articulable facts which reasonably lead him to conclude that the suspect might possess a weapon.[34] Reasonable suspicion in this context is based on an objective assessment of the officer's actions in light of the facts and circumstances surrounding the detention.[35] The officer's subjective level of fear is not controlling.[36] The question is whether a reasonably prudent person would justifiably believe that his safety or the safety of others was in danger.[37]
The court of appeals held that Salinas lacked reasonable suspicion to conduct the initial pat-down of Appellant and that Salinas unreasonably prolonged the stop. We disagree. For the reasons explained below, we find that Salinas was justified in conducting the pat-down search and that the initial detention had not been unduly prolonged at the point Appellant fled.
1. Salinas had reasonable suspicion to conduct a pat-down.
First, we address the reasonableness of the pat-down. We note that Salinas had probable cause to pull the vehicle over[38] and was permitted to order Appellant, the passenger of the vehicle, out of the car for safety reasons.[39] The purpose of the pat-down search is to protect the officer's safety during interactions such as this, when the suspect is in close quarters with the officer. The Supreme Court has noted that it would be unreasonable to require police officers to take unnecessary risks in performing their duties and that traffic stops are "especially fraught with danger to police officers."[40]
*192 We find this case analogous to O'Hara v. State . In O'Hara , we noted that an officer may not conduct a pat-down search as a matter of routine, as Salinas testified he did in this case.[41] However, we also recognized that objective facts can justify a pat-down even when the officer conducts a pat-down as part of a stated routine.[42] In O'Hara , Trooper Muhler stopped O'Hara, a truck driver, for malfunctioning clearance lights on his truck at 3:30 a.m.[43] Muhler conducted his standard safety inspection of the truck.[44] Muhler noticed O'Hara was wearing a belt knife, but allowed him to wear it during the inspection.[45] After the inspection, Muhler told O'Hara to get his paperwork and that they would go to Muhler's patrol car for Muhler to write the report.[46] Muhler asked O'Hara to leave the belt knife in the truck, which he did.[47] Muhler told O'Hara he would let O'Hara sit in the patrol car, but he needed to pat him down for weapons first.[48] Muhler testified that this was his standard procedure.[49] When Muhler patted O'Hara down, he found marijuana.[50] He arrested O'Hara and later found cocaine.[51]
In finding that Muhler had reasonable suspicion to conduct a pat-down, we noted three specific facts:(1) Muhler was conducting the stop alone, (2) it was the middle of the night, and (3) O'Hara had previously been wearing a knife.[52] The fact that O'Hara removed the belt knife prior to the pat-down did not diminish the reasonableness of the search because he could have possessed additional weapons on his person; the need to discover weapons did not disappear once the person removed the obvious weapon.[53]
Similarly here, Salinas was conducting the stop alone at night. Not only was he alone, but Salinas was outnumbered by Appellant and the two other adult occupants of the vehicle. Although Appellant admitted to having a pocket knife before the pat-down, this did not alleviate the potential threat of additional weapons.[54] Additionally, Salinas had observed Appellant moving around and reaching into his pockets while he was in the vehicle. This case presents facts which mirror those in O'Hara and provides additional factors which increase the likelihood of danger. Although Salinas testified that he conducted the pat-down out of routine, Salinas's subjective thought processes do not control.[55] We find that a reasonable officer in Salinas's situation would be justified in fearing for his safety and thus conducting a pat-down search for weapons.
2. Salinas did not unduly prolong the detention.
Next, we address whether Salinas unlawfully prolonged the traffic stop. The United State's Supreme Court recently *193 discussed unduly prolonged traffic stops in Rodriguez v. United States .[56] In Rodriguez , Officer Morgan Struble pulled Rodriguez over for driving on the highway shoulder, a violation of Nebraska law.[57] Struble approached the vehicle and advised Rodriguez why he was pulled over.[58] Struble ran a computer check on Rodriguez, then separately conducted a computer check on the passenger.[59] Struble also questioned the passenger about where the men were coming from and where they were going.[60] After running both computer checks and determining that neither man had outstanding warrants, Struble issued a written warning.[61] The written warning was issued twenty-one minutes after the officer initially pulled the vehicle over.[62]
After the warning was issued and Struble returned the documents to Rodriguez and the passenger, Struble asked permission to walk his dog around Rodriguez's vehicle.[63] Rodriguez said no.[64] Struble then instructed Rodriguez to exit the vehicle.[65] After a deputy sheriff arrived, Struble walked his dog around Rodriguez's car.[66] The dog alerted to the presence of drugs; a bag of methamphetamine was found in the car.[67] In total, seven or eight minutes elapsed from the time the officer issued the warning until the dog indicated the presence of drugs.[68]
Rodriguez challenged the legality of the search, arguing that the officer had unduly prolonged the traffic stop without reasonable suspicion to conduct the dog sniff.[69] The Supreme Court agreed. It held that a seizure justified only by a police-observed traffic violation becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.[70]
In so holding, the Court noted that traffic stops may last no longer than necessary to effectuate the purpose of the stop.[71] In addition to determining whether to issue a traffic ticket, the police officer's investigation also includes the ordinary inquiries incident to the traffic stop such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance.[72] The Court also noted that traffic stops are often dangerous to police officers and that an officer may need to take some negligibly burdensome precautions to complete *194 the investigation safely.[73] The legitimate and weighty interest in officer safety, therefore, may outweigh a "di minimis " intrusion on the occupant's Fourth Amendment rights, such as requiring a driver and passenger to exit the vehicle during the stop.[74]
Salinas's actions in this case are more like Officer Struble's actions in Rodriguez before he issued the written warning. Both Salinas and Struble originally interacted with the driver of the vehicles, then questioned the passenger of the vehicles, and both officers sought to determine the identity of the passenger as part of the traffic stop. Notably, the Supreme Court did not comment on Struble's interactions with the passenger nor indicate that such interactions unreasonably prolonged the traffic stop in any way. It was also reasonable for Salinas to ask Appellant to exit the vehicle in this case because Salinas was the sole officer on the scene and he had observed Appellant making furtive movements in the vehicle.
Most importantly, the prolonged detention in Rodriguez occurred after the officer had completed all tasks associated with the traffic stop. Unlike the officer in Rodriguez , Salinas was still actively involved in the traffic stop when he questioned Appellant and he had not yet completed all aspects of the traffic stop at the point that Appellant fled. Most obviously, Salinas had not yet conducted a computer warrant check on the driver of the vehicle.
We have previously rejected a prolonged detention argument under circumstances analogous to those presented in this case. In Kothe v. State , the officer conducted a traffic stop on a vehicle which matched the car in a radio dispatch about a possibly intoxicated driver.[75] When the officer approached Kothe, the driver, he asked for Kothe's driver's license.[76] The officer conducted a field sobriety test on Kothe, in conjunction with running a driver's license and warrant check.[77] The officer concluded that Kothe was not intoxicated and returned to his patrol car to wait for the results of the warrant check.[78] The check showed no warrants; however, as the officer prepared to release Kothe he received a second dispatch which described Kothe and suggested he may be in possession of a blue bank bag containing silver coins taken from someone's household safe.[79] The officer approached Kothe and asked about the bag and coins.[80] Kothe gave the officer consent to search the vehicle.[81] During the search the officer did not find the blue bank bag, but he did find drug paraphernalia.[82] The passenger admitted that she had two baggies of heroin, which Kothe had asked her to hold.[83] The officer arrested Kothe and the passenger for possession of heroin and drug paraphernalia.[84]
Kothe sought to suppress the drug evidence, arguing that the continued detention of him after the officer had determined that he was not intoxicated was *195 constitutionally unreasonable and illegal.[85] Kothe specifically pointed to the estimated three to twelve minutes between when the officer determined that he was not intoxicated and when he re-approached him to ask about the blue bank bag.[86] We recognized that, on a routine traffic stop, police officers may request certain information from a driver, such as a driver's license and car registration, and may conduct a computer check on that information.[87] We also pointed out that police may diligently pursue means of investigation likely to confirm or dispel their suspicions of other crime quickly, so long as they do not unnecessarily detain the driver.[88] Though police cannot use a license check solely as a means to extend a traffic stop, our Fourth Amendment precedent does not dictate that an officer making a traffic stop must investigate the situation in a particular order.[89] A license check only unduly prolongs the detention when the officer's action is unreasonable under the circumstances.[90]
Under the circumstances in this case, we cannot say that Salinas acted unreasonably by questioning Appellant before running the driver's license for a warrant check. In particular, Salinas acted diligently in his investigation into the traffic stop and questioning Appellant, as indicated by the brief amount of time between the initiation of the stop and Appellant's flight and subsequent arrest. Salinas initiated the stop at 10:55 p.m. and Appellant fled from the officers at 11:04 p.m., a mere nine minutes later. Importantly, Salinas was joined by back-up at 10:59 p.m. and discovered that Appellant had provided a false identity at 11:00 p.m., a mere five minutes after the initial stop. During that first five minutes, Salinas informed the driver of the reason he was pulled over, requested the driver's identification and insurance information, and checked the driver's insurance information. Salinas also asked Appellant to exit the vehicle and conducted a pat-down of Appellant, which he was justified in doing. We cannot say that the five minutes between the initial stop and the moment when Salinas discovered that Appellant had provided a false name was an unreasonable amount of time to investigate the situation. This is particularly true given that Salinas's actions were all connected to the traffic stop during that time.
3. St. George is distinguishable
The court of appeals relied on our decision in St. George in holding that Salinas was not justified in prolonging the stop to question Appellant. We find St. George distinguishable from the present case. In St. George , two deputies stopped a vehicle for having an inoperative license plate light.[91] After receiving the driver's license, the deputy asked the passenger for his identification.[92] The passenger identified himself as John Michael St. George and told the deputy he did not have his driver's license with him.[93] Both deputies returned to the patrol unit to run the information *196 they received.[94] The license and warrant checks for the driver came back clear, but there was no record matching the name the passenger provided.[95] The officers issued the driver a warning citation approximately nine minutes into the stop.[96]
It was only after the officer indicated to the driver that the traffic stop was complete, by giving the driver a warning, that the other officer began to question the passenger.[97] During that questioning, the deputy learned that the passenger's real name was Jeffrey Michael St. George.[98] After a further ten minutes of questioning after the completion of the traffic stop, the deputies arrested St. George on warrants they identified when they ran his proper name.[99] The officers found marijuana on St. George during a search incident to arrest.[100]
In reviewing the legality of St. George's pre-arrest detention, we held that the deputies unlawfully prolonged the detention because they lacked reasonable suspicion to continue questioning St. George once the initial reason for the traffic stop ended.[101] We noted that the only facts the deputies gave as their reason to continuing questioning St. George was his nervousness and providing a false name.[102] However, the deputies did not know the name was false when they began questioning St. George.[103] This left only the fact of St. George's nervous behavior to support the continued detention. We held that nervousness alone was not enough to amount to reasonable suspicion after the purpose of the traffic stop had concluded.[104]
One clear difference between St. George and the case at hand is the presence of a second officer in St. George . In St. George , both deputies were involved in issuing the traffic citation and it wasn't until after the citation was given that they turned their attention to St. George. In this case, Salinas was the sole officer at the scene. He was required to conduct all aspects of the traffic stop by himself until his backup arrived. Given that he was alone, it was reasonable for Salinas to briefly question and attempt to identify the occupants of the car before running the driver's information through his computer system in his patrol car. As we have noted, an officer does not have to follow a particular order of events when conducting a stop.[105] Almost *197 immediately after another officer arrived, Salinas did in fact return to his patrol car to run the information through his system.
Another key difference between St. George and the case at bar is the timing in which the events occurred. In St. George , the deputy did not begin questioning St. George until after he had completed a computer check on the driver and issued a citation, nine minutes into the traffic stop.[106] Further, the deputies questioned St. George for an additional ten minutes before they obtained enough information to arrest him.[107] Here, Salinas was still actively engaged in the purposes of the traffic stop when he asked Appellant to exit the vehicle and briefly questioned him. Salinas may have decided that he was not going to issue a citation to the driver for the traffic violation, but the traffic stop was not complete. Salinas still had the driver's license and had to run a computer check on his information, which we have already determined was a reasonable course of action.
By the time Appellant was arrested following his flight, Salinas had observed at least three criminal offenses committed in his presence: failure to identify,[108] possession of synthetic marijuana,[109] and flight from lawful detention.[110] Peace officers may make an arrest for any offense committed in their presence.[111] Therefore, Appellant's arrest made after Salinas had observed these offenses was justified. The officers were permitted to search Appellant upon his arrest.[112] We agree with the trial court that the evidence in this case was lawfully seized.
Conclusion
Salinas was justified in conducting a pat-down of Appellant. Early on in the traffic stop, Salinas developed reasonable suspicion to continue questioning Appellant. After Appellant's flight, the officers had probable cause to arrest Appellant for several offenses. The cocaine in question was found on Appellant's person following a lawful detention and arrest. There was no initial illegality in either the pat-down or the length of detention. So, there can be no taint, and we need not address the State's argument regarding attenuation. The trial court correctly denied Appellant's motion to suppress. We reverse and remand.

Driving with an unrestrained child constituted an additional traffic offense. See Tex. Transp. Code § 545.412(a) ("A person commits an offense if the person operates a passenger vehicle, transports a child who is younger than eight years of age, unless the child is taller than four feet, nine inches, and does not keep the child secured during the operation of the vehicle in a child passenger safety seat system according to the instructions of the manufacturer of the safety seat system."). Though Salinas ultimately gave the driver a warning, he still waited until a friend of the female passenger brought a car seat to the scene before letting the driver drive away.

Salinas testified that when people don't have physical identification on them he usually tries to separate them from the rest of the people in the car to get a proper identification. He stated that "[p]eople give false names, at times. And if the other people in the car hear, they may go along with the story, thinking that there is a reason why that person is lying in the first place."

The initial pat-down occurred at 10:58 p.m., three minutes into the traffic stop. On cross-examination, Salinas testified that he had a hunch that Appellant may be nervous due to having weapons. Salinas justified his pat-down of Appellant as part of his normal protocol when he has someone exit a vehicle during a stop.

Salinas described Appellant's nervousness at the suppression hearing: "His hands were shaking. He just seemed to be very unsure of himself, seemed to not want to have contact with the police.... he did not seem to want to step out [of the vehicle], continuously moved about his-his seat and was reaching towards his pockets."

The record reflects Appellant's actual date of birth is October 24, 1982.

The computer program listed Bobby Diaz as five feet, eleven inches, and 190 pounds. The police reports indicate that Appellant was about five foot, six inches, and 170 pounds.

237 S.W.3d 720 (Tex. Crim. App. 2007).

Lerma v. State , No. 13-15-00417-CR, 2016 WL 5820490, at *6 (Tex. App.-Corpus Christi, Sept. 15, 2016) (not designated for publication).

Id. at *6.

Id.

Id.

Id.

Id. Although Salinas testified that he had finished the investigation as to the reason the vehicle was pulled over, he further testified that the traffic stop was not complete. He noted that he still had to run the driver's name and investigate anything else that may have come up. Salinas also stated that he had not issued a warning or a citation at that point.

Id.

Furr v. State , 499 S.W.3d 872, 877 (Tex. Crim. App. 2016).

State v. Ross , 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

Carmouche v. State , 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

Furr , 499 S.W.3d at 877 (citing Crain v. State , 315 S.W.3d 43, 48-49 (Tex. Crim. App. 2010) ).

Ford v. State , 158 S.W.3d 488, 493 (Tex. Crim. App. 2005).

Arguellez v. State , 409 S.W.3d 657, 662-63 (Tex. Crim. App. 2013).

Terry v. Ohio , 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Carmouche , 10 S.W.3d at 328.

Terry , 392 U.S. at 19-20, 88 S.Ct. 1868.

Id. at 20, 88 S.Ct. 1868.

Id.

Guerra v. State , 432 S.W.3d 905, 911 (Tex. Crim. App. 2014).

See Kothe v. State , 152 S.W.3d 54, 63-64 (Tex. Crim. App. 2004).

Id. at 63.

Arizona v. Johnson , 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009).

See United States v. Brigham , 382 F.3d 500, 511 (5th Cir. 2004).

Kothe , 152 S.W.3d at 63-64.

St. George , 237 S.W.3d at 726-27.

Terry , 392 U.S. at 27, 88 S.Ct. 1868.

Id. at 27, 88 S.Ct. 1868 ; see also Carmouche , 10 S.W.3d at 329.

O'Hara v. State , 27 S.W.3d 548, 551 (Tex. Crim. App. 2000).

Id.

Id.

Salinas had observed the driver of the vehicle commit two traffic violations: failing to stop behind the line at a red light (see Tex. Transp. Code § 544.007(d) ); and failing to use his turn signal at least 100 feet prior to the intersection (Id. § 545.104(b)).

See Maryland v. Wilson , 519 U.S. 408, 414-15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (noting that "danger to an officer is likely to be greater when there are passengers in addition to the driver stopped in the car[,]" and holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

Michigan v. Long , 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

27 S.W.3d at 553.

Id. at 554.

Id. at 549.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.case-ids="11191164" index="57" url="https://cite.case.law/sw3d/27/548/#p551"> at 555.

Id. at 554.

See id.

Id. (noting that the law forbids us to view the facts subjectively).

--- U.S. ----, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015).

Id. at 1612.

Id. at 1613.

Id. Struble obtained Rodriguez's license, returned to his patrol car, and ran a computer check on Rodriguez. Struble then returned to Rodriguez's car, obtained the passenger's license, returned to his patrol car, and ran a computer check on the passenger.

Id.

Id.

Id. at 1612-13.

Id. at 1613.

Id.

Id.

Id.

Id.

Id.

Id.

Id. at 1612 (citing Illinois v. Caballes , 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ).

Id. at 1614.

Id. at 1615.

Id. at 1616.

Id. at 1615.

152 S.W.3d at 58.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.case-ids="9040066" index="92" url="https://cite.case.law/sw3d/152/54/#p63"> at 63. As discussed above, the United States Supreme Court expressed a similar understanding of a police officer's duties attendant to a routine traffic stop in Rodriguez . See Rodriguez , 135 S.Ct. at 1615.

Id.

Id. at 65.

Id.

237 S.W.3d at 721-22.

Id. at 722.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.case-ids="8366956" index="106" url="https://cite.case.law/sw3d/237/720/"> at 727. We note that in St. George we stated that we did not intend to create a bright line rule that would automatically make an investigative detention unreasonable the moment a citation is issued. Id. However, in both St. George and Rodriguez the officers had indicated to the driver that the traffic stop was complete, by issuing warnings and explaining those warnings to the respective drivers. In both cases, the continued detention, after it was made clear to the driver that the traffic stop was complete, was unreasonable. Notably, in this case, during the time in question, Salinas did not issue a warning or citation and did not indicate that the traffic stop was complete. Although he may have subjectively determined his likely course of action on the initial traffic violation, he had not communicated that to the driver, nor completed the other tasks associated with a traffic stop.

Id. at 726.

Id.

Id.

See Brigham , 382 F.3d at 511.

237 S.W.3d at 722.

Id.

"A person commits an offense if he intentionally gives a false or fictitious name, residence address, or date of birth to a peace officer who has lawfully detained the person." Tex Penal Code § 38.02(b)(2).

"Except as authorized by this chapter, a person commits an offense if the person knowingly possesses a controlled substance listed in Penalty Group 2-A, unless the person obtained the substance directly from or under a valid prescription or order of a practitioner acting in the course of professional practice." Tex. Health & Safety Code § 481.1161(a). Synthetic marijuana is a Penalty Group 2-A substance. See id. § 481.1031(b)(3).

"A person commits an offense if he intentionally flees from a person he knows is a peace officer or federal special investigator attempting lawfully to arrest or detain him." Tex. Penal Code § 38.04(a).

"A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view." Tex. Code Crim. Proc. art. 14.01(b).

Chimel v. California , 395 U.S. 752, 762-63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ; see also State v. Gray , 158 S.W.3d 465, 470 (Tex. Crim. App. 2005).