# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00017-CR

**Yordanys Avila-Trujillo, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 274TH DISTRICT COURT OF HAYS COUNTY
### NO. CR-17-0881, THE HONORABLE GARY L. STEEL, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

After the trial court denied his motion to suppress evidence, Yordanys Avila-Trujillo pleaded guilty to one count of forgery, *see* Tex. Penal Code § 32.21(b), (e)(2); one count of fraudulent possession of identifying information, *see id.* § 32.51(b), (c)(3); and fifteen counts of credit-card or debit-card abuse, *see id.* § 32.31(b). The trial court assessed his punishment at five years' imprisonment for the forgery, five years' imprisonment for the fraudulent possession of identifying information, and two years' imprisonment for each instance of credit-card or debit-card abuse, with all sentences running concurrently.

In his sole appellate issue, Avila-Trujillo contends that the trial court should have granted his motion to suppress because the officer allegedly unlawfully prolonged his detention. We affirm. The trial court correctly denied the motion because the detaining officer had reasonable suspicion of criminal activity beyond traffic violations, such as concealing contraband, before the officer allegedly unlawfully prolonged the detention.

## BACKGROUND

On the night of July 26, 2016, Detective Patrick Aubry, then a patrol officer with the San Marcos Police Department, was working patrol on northbound Interstate 35. He initiated a traffic stop of Avila-Trujillo after witnessing several traffic offenses: Avila-Trujillo's reckless driving, making an unsafe lane change, and speeding. Specifically, Aubry observed Avila-Trujillo speeding and almost striking his patrol car when Avila-Trujillo tried to change lanes. Aubry followed Avila-Trujillo, and when he turned on his patrol lights, his dashboard video camera started recording. Aubry's entire encounter with Avila-Trujillo, all recorded by the dashcam, lasted about 17 minutes and 15 seconds, by the end of which Avila-Trujillo was detained and speaking with a Spanish-speaking officer.

After Aubry flashed his patrol lights, Avila-Trujillo pulled over to the right but in a position that Aubry considered dangerous for them both. Instead of taking the next exit, Avila-Trujillo pulled over before the exit, on top of a bridge and with no space between his driver's-side tires and the solid white line and where nearby traffic was traveling at 70 miles per hour. From his training and experience conducting many hundreds of traffic stops, Aubry knew I-35 to be a common corridor for criminal activity, like transporting drugs and human trafficking.

The spot where Avila-Trujillo stopped raised Aubry's suspicions. According to Aubry, drivers stop on bridges "when they're attempting to conceal something within the vehicle or to get rid of something." They can "easily throw something over the bridge when the officer is distracted when either looking at traffic or walking to and from the car[,] and then [the officer] would never see it on the roadway." Aubry thought it common for drivers to stop in dangerous positions, like Avila-Trujillo did, when they want "a distraction because they know the officer will obviously be distracted with looking at traffic coming through the area."

2

Aubry got out of his car and told Avila-Trujillo and his passenger to pull off the interstate at the nearby exit. They responded in Spanish, which Aubry does not speak, so he pointed to the exit, and Avila-Trujillo and his passenger pointed in response in acknowledgement.

When he drove toward the exit, Avila-Trujillo exhibited even more of what Aubry thought to be "very odd behavior." He drove noticeably slowly—"crawling on the interstate"—and "took a minute and fifty seconds to travel a hundred yards." This made Aubry "increasingly suspicious . . . as to what was going on inside the vehicle during that minute and fifty seconds because that's the first and only time that's ever happened in the hundreds and hundreds if not thousands of traffic stops that [he has] conducted."

Once on the access road, Avila-Trujillo was "going on and off the brakes and turning on and off his hazards," which Aubry thought to be more "odd behavior." He drove some distance on the access road, passing a few driveways. And still before Avila-Trujillo came to a stop, his passenger stuck an arm outside the car's window. To Aubry, this was either a signal that Avila-Trujillo was finally pulling over or another distraction.

Avila-Trujillo eventually pulled into a parking lot but only far enough so that Aubry's trailing patrol car was still partly in the road. Aubry honked his horn to get Avila-Trujillo to pull in more completely. Once there, Aubry honked again to get Avila-Trujillo to come to a complete stop because he was "slow rolling in the parking lot."

At this point, although the initial reason for the stop was for traffic violations, Aubry now felt that he had other reasons for the stop. These included Avila-Trujillo and his passenger's erratic behavior, which Aubry thought "not normal" and which caused him "some concerns . . . with what was going on inside that vehicle," based on his training and experience. His other concerns were Avila-Trujillo's "placing his foot on and off the accelerator as if he was

3

possibly preoccupied with something else inside the vehicle"; his turning his hazards and turn signals on and off "as he crawled down the interstate"; and the possibilities that there was a weapon or contraband inside the vehicle, that they were "getting a gun ready," and that there could be "something else more than a speeding ticket" involved. These concerns led Aubry to prepare to call for a backup unit, but he noticed that there was one behind him already.

Aubry positioned his car behind Avila-Trujillo's for cover if needed and approached cautiously as if Avila-Trujillo had a weapon. Aubry had Avila-Trujillo get out of the car for officer safety to "see better inside the vehicle" for weapons. Aubry wanted to talk to Avila-Trujillo as part of his investigation because he had suspicions about him and his passenger. He wanted to ask them separately where they were going and where they were coming from and then compare their stories for "holes" or inconsistencies, which would reveal whether the two were fabricating something and "likely engaging in criminal behavior." Inconsistent or distracting behavior suggests to Aubry that something "is being concealed in [a] vehicle."

He asked Avila-Trujillo where he was coming from, but they had trouble communicating, so Aubry called for a Spanish-speaking officer. Avila-Trujillo produced a Kentucky driver's license, and Aubry radioed colleagues to run its information. He tried to ask the passenger where they were coming from but had trouble communicating with him too.

Aubry returned to his patrol car to run Avila-Trujillo's license plate. He discovered that neither Avila-Trujillo nor his passenger was the car's registered owner. That suggested to Aubry that the two were possibly "using somebody else's vehicle to conduct" criminal behavior. That is because "[a] lot of people don't like to use their own vehicle to do criminal behavior" and will "rent a vehicle or borrow a vehicle" instead, which can make it harder for law enforcement to

4

identify "the person who was conducting that illegal activity" because investigating a car recorded on surveillance video will instead lead to the car's registered owner.

Then, around 11:10 (minutes:seconds) into the dashcam recording, Aubry learned that Avila-Trujillo's Kentucky license was "clear" and that the passenger's Kentucky license was "valid." He had also run warrant checks on them by this point.[1] Aubry next got out of his car and approached the passenger to ask him again where they were going. After more difficulty communicating with the passenger, Aubry spoke to Avila-Trujillo again, who agreed to open the car's trunk for Aubry. The Spanish-speaking officer joined Aubry about a minute later, around 14:55. With the officer's help, Aubry asked Avila-Trujillo where he was coming from.

Aubry learned that they were driving from Laredo to Dallas on return from an earlier trip from Kentucky to Laredo to pick up a friend. The friend did not join them, however. Aubry found this odd and also knew Laredo to be "a major player" in human trafficking, drugs, and money-laundering, where people pick up contraband from "stash houses." He finished questioning the two, and their stories did not match. They then consented to a search of the car, and the officers found contraband. Hidden in the glove box or dashboard were other people's credit- and debit-card information on "Green Dot Visa cards" whose "number[s] on the magnetic strip d[id] not match the number[s] on the actual card"; a fraudulent Texas ID with the passenger's photo but other people's identifying information; and a fake license with Avila-Trujillo's picture.

The State indicted Avila-Trujillo for one count of forgery, one count of fraudulent possession of identifying information, and fifteen counts of credit-card or debit-card abuse. He

---

[1] The recording's time count is significant because at the hearing on Avila-Trujillo's motion to suppress, his counsel said that the "only real issue . . . is really from about 11:15 [on the video] to 14:55 approximately and whether there was reasonable suspicion to hold him for that time period."

moved to suppress the evidence collected from the stop and ensuing detention, arguing that Aubry

unlawfully prolonged the detention for the Spanish-speaking officer to join them because Aubry

had already fulfilled the purposes of the traffic stop once he learned that Avila-Trujillo's Kentucky

license was clear and that he was without warrants. The trial court held an evidentiary hearing on

the motion, at which only Aubry testified and his dashcam recording was admitted. The trial court

denied the motion and entered these findings of fact and conclusions of law:

FINDINGS OF FACT

The Court heard testimony and reviewed audio visual media of the traffic violation, through the arrest of the Defendant and search of the vehicle. This took place on August 2nd, 2018.

This was a warrantless arrest.

The Defendant was speeding down IH 35 and failed to maintain a single marked lane.

The Defendant failed to stop in a safe place, stopping on IH 35 next to the edge of an overpass. The officer testified this was from his training and experience indicative of the Defendant buying time to conceal something from the officer.

The Defendant then went slowly, exiting IH 35, and passing on the access road many safe places to stop. The officer testified this was from his training and experience indicative of the Defendant buying time to conceal something from the officer.

 . . . .

The car was registered in Kentucky. The car was registered to a third person not present. The Defendant had a Kentucky Driver's License, but the Defendant indicated he lived in Dallas, Texas.

 . . . .

A Spanish speaking officer arrived to translate throughout the interaction.

The Defendant provided consent to search the vehicle.

Multiple items were found in the vehicle and on the persons. Among these items found was a fraudulent ID with the picture of the Defendant on it. The officer

6

arrested the Defendant and passenger for Fraudulent Use or Possession of Identifying Information 10 or more but less than 50.

CONCLUSIONS OF LAW

The traffic offense resulted in Probable Cause to effect a traffic stop.

The behavior of the vehicle from the time the officer turned on his red and blue lights to effect the traffic stop and the time the vehicle stopped provided reasonable suspicion that a crime was afoot or that contraband was being concealed.

The Answers to the officer's questions during the detention from both the Defendant and passenger combined with the officer's training and testimony provided probable cause that a crime was being committed and contraband was in the vehicle. This allowed the officer to search the vehicle.

The Defendant also consented to a search of the vehicle.

Avila-Trujillo entered into a plea agreement but reserved his right to appeal, which he now exercises.

## STANDARD OF REVIEW AND APPLICABLE LAW

### *Review of denial of motion to suppress evidence with findings of fact and conclusions of law*

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). At the hearing on the motion, the trial court is the sole factfinder and judge of the credibility of the witnesses and of the weight to be given their testimony. *Id.* at 190. We therefore afford almost complete deference to the trial court's determinations of historical facts. *Id.* But we review de novo the legal significance of the facts found by the trial court, including, for example, whether they suffice to give rise to reasonable suspicion. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35 (Tex. Crim. App. 2017); *accord Lerma*, 543 S.W.3d at 190.

We must view the evidence in the light most favorable to the trial court's decision on the motion. *State v. Garcia*, 569 S.W.3d 142, 152–53 (Tex. Crim. App. 2018). When, as here, the trial court makes explicit fact findings, we determine whether the evidence, still viewed in the light most favorable to the trial court's decision, supports the findings. *Id.* at 153. We must defer to the trial court's findings if they, when read in their totality, reasonably support the trial court's legal conclusion. *Id.* This is so even if the findings might be ambiguous when viewed piecemeal and in isolation. *Id.* We give non-technical, common-sense deference to each finding individually and to the totality of the findings. *See id.*

We sustain the trial court's decision on the motion if it is correct under any applicable theory of law. *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). We may reverse only when the decision is arbitrary, unreasonable, or outside the zone of reasonable disagreement. *Id.*

### The Fourth Amendment and warrantless traffic stops

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV; *Lerma*, 543 S.W.3d at 190. Its protections extend to brief, warrantless investigatory stops of persons or cars that fall short of a traditional arrest. *See Ramirez-Tamayo*, 537 S.W.3d at 36. In such a traffic stop, an officer has the right to stop a car when the officer has reasonable suspicion to believe that a traffic violation involving it has occurred. *Lerma*, 543 S.W.3d at 190.

A traffic stop to investigate a traffic violation must be reasonably related to that purpose and may not last past the time needed to complete the tasks associated with the traffic stop. *Id.* Those tasks may include requesting certain information from the driver, like driver's license, registration, and proof of insurance, and running a computer check on the information. *Id.*

8

There is no *per se* rule that an officer must immediately conduct a computer check on the information before questioning the car's occupants. *Id.* at 190–91.

Traffic stops are often dangerous for officers, so an officer may need to take some negligibly burdensome precautions to complete the investigation safely. *Id.* at 193–94 & n.73 (citing *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)). The legitimate and weighty interest in officer safety therefore outweighs a *de minimis* intrusion on the driver's Fourth Amendment rights. *Id.* at 194 & n.74 (citing *Rodriguez*, 575 U.S. at 356).

### *Prolonging a traffic stop beyond the purpose of the traffic stop*

"Once the computer check is completed, and the officer knows that the driver has a current valid license, no outstanding warrants, and the car is not stolen, the traffic stop investigation is fully resolved." *Id.* at 191. "An officer is also permitted to ask drivers and passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop." *Id.* at 190. The Supreme Court of the United States has "held that a seizure justified only by a police-observed traffic violation becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 193 & n.70 (citing *Rodriguez*, 575 U.S. at 350–51).

Continuing a brief investigatory detention beyond the time necessary to investigate a traffic violation requires reasonable suspicion of criminal activity apart from the traffic violation. *See Ramirez-Tamayo*, 537 S.W.3d at 36 (citing *Rodriguez*, 575 U.S. at 357–58). "[I]f an officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity the officer may continue questioning the individual regardless of whether the official tasks of a traffic stop have come to an end." *Lerma*, 543 S.W.3d at 191. Police may diligently pursue

means of investigation likely to confirm or dispel their suspicions of other crime quickly so long as they do not unnecessarily detain the driver. *Id.* at 195.

*Reasonable suspicion*

Reasonable suspicion to detain a person exists when an officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead the officer to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity. *Ramirez-Tamayo*, 537 S.W.3d at 36. The standard for reasonable suspicion is an objective one, so it disregards the officer's actual subjective intent and looks instead to whether there was an objectively justifiable basis for the detention. *Id.* To assess whether reasonable suspicion exists, a reviewing court must look to the totality of the circumstances for whether the officer had a particularized and objective basis for suspecting legal wrongdoing. *Id.* For example, although in isolation some circumstances surrounding a detention may seem innocent, if the totality of the circumstances reasonably suggests the imminence of criminal conduct, then an investigative detention is justified. *See id.*

A reviewing court may consider the officer's ability to draw on the officer's own experience and specialized training to make inferences from, and deductions about, all the information available that otherwise might elude an untrained person. *Id.* A reviewing court must give due weight to factual inferences drawn by local judges and law-enforcement officers. *Id.*

Information that is detailed and reliable enough to suggest that "something of an apparently criminal nature is brewing" satisfies the standard of reasonable suspicion. *Id.* By contrast, an inarticulate hunch or intuition is not enough. *Id.* Reasonable suspicion also may attach

10

to "particular non-criminal acts," so whether particular conduct is innocent or criminal is not the relevant inquiry. *See id.* Reasonable suspicion may exist even amid innocent conduct. *Id.*

## DISCUSSION

In his sole appellate issue, Avila-Trujillo contends that the trial court should have granted his motion to suppress. He argues that Aubry unlawfully prolonged the detention for the Spanish-speaking officer to join them, with the prolonging occurring from about 11:10 to 14:55 on the dashcam recording. He considers the detention to have been simply a traffic stop, for which Aubry had no "probable cause that a crime was being committed and contraband was in the" car, aside from traffic violations. In Avila-Trujillo's view, "the detention became unreasonable when Officer Aubry turned his attention from the traffic stop to acquiring consent to search" the car.

In response, the State points to Avila-Trujillo's behavior between the time that Aubry first turned on his patrol lights, which happened at about 00:55 on the recording, to the time that the checks on Avila-Trujillo's license and car came back clear, which happened at about 11:10. It says that the behavior "created a reasonable suspicion that other criminal activity was afoot" beyond traffic violations. The State also points to Avila-Trujillo's car's being registered to someone else.

We agree with the State. While Aubry may have initiated the stop for traffic violations, Avila-Trujillo and his passenger's conduct before finally stopping in the parking lot gave Aubry articulable reasonable suspicion that criminal activity was afoot with Avila-Trujillo potentially concealing contraband in the car. Aubry's suspicions began when Avila-Trujillo pulled over on the side of I-35—a route known to a local officer like Aubry, *see Ramirez-Tamayo*, 537 S.W.3d at 36, to be a route for criminal activity—in an unsafe position for both Avila-Trujillo

11

and Aubry. The unsafe conditions, especially including stopping on the bridge, led Aubry to believe that Avila-Trujillo was trying to distract him so that he could conceal contraband, for example, by throwing it off the bridge. *See id.* Aubry's suspicions grew when Avila-Trujillo was leaving the interstate, "crawling" slowly like no driver Aubry had ever seen before, and then driving on the access road. On the access road, Avila-Trujillo passed available safe stopping places, he only intermittently accelerated, he turned his hazard lights and turn signals on and off, and his passenger stuck an arm outside the window. Aubry has made many hundreds of traffic stops and saw all this as Avila-Trujillo and his passenger trying to distract him and conceal something in the car. After Avila-Trujillo stopped in the parking lot, Aubry made manifest his suspicions by preparing to call for backup. He then discovered that the car was not registered to either Avila-Trujillo or his passenger, also suspicious to Aubry. All this constitutes a set of specific, articulable facts and related rational inferences that allowed the trial court to reasonably conclude as it did that "[t]he behavior of the vehicle from the time the officer turned on his red and blue lights to effect the traffic stop and the time the vehicle stopped provided reasonable suspicion that a crime was afoot or that contraband was being concealed." *See id.*

We therefore hold that Aubry had reasonable suspicion of criminal activity beyond traffic violations, such as concealing contraband, before the time that Avila-Trujillo says that Aubry unlawfully prolonged the detention past the time needed to complete a traffic-violation investigation. Aubry's continuing the detention to wait for the Spanish-speaking officer to join them to question Avila-Trujillo about where he was coming from and where he was going thus met the requirements of the Fourth Amendment for confirming or dispelling Aubry's reasonable suspicion of criminal activity beyond traffic violations. *See Lerma*, 543 S.W.3d at 191, 195; *Ramirez-Tamayo*, 537 S.W.3d at 36; *see also Vasquez v. State*, 324 S.W.3d 912, 920 (Tex. App.—

12

Houston [14th Dist.] 2010, pet. ref'd) (holding that officer had reasonable suspicion to detain driver beyond traffic stop in part because "the initial stop was out of the ordinary," driver was traveling to "a high-crime area" that was "a source location for the ultimate destination of drugs and narcotics," and officer had relevant "past training in identifying signs of someone involved in a crime" (internal quotations omitted)).

Our analysis does not rely on any of Avila-Trujillo's or his passenger's later statements. The facts and inferences that we have described as sufficiently supporting Aubry's reasonable suspicion all occurred before the delay that transpired between learning that Avila-Trujillo's Kentucky license was generally clear at around 11:10 on the recording and the Spanish-speaking officer's joining the conversation at around 14:55. We therefore need not review the trial court's conclusion about "the [a]nswers to the officer's questions during the detention from both the Defendant and passenger" or reach Avila-Trujillo's argument that that conclusion was erroneous because Aubry could not understand Spanish. *See* Tex. R. App. P. 47.1.

We overrule Avila-Trujillo's sole appellate issue.

## CONCLUSION

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed: January 5, 2021

Do Not Publish

13