# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO.  03-24-00659-CR

**Brandy Dawn Todd, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 51ST DISTRICT COURT OF TOM GREEN COUNTY
### NO. A-24-0184-SB, THE HONORABLE CARMEN DUSEK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Brandy Dawn Todd was arrested and charged with the offense of possession with intent to deliver four grams or more and fewer than two hundred grams of methamphetamine. *See* Tex. Health & Safety Code § 481.112(a), (d).  Before trial, Todd filed a motion to suppress evidence obtained during the traffic stop that led to her arrest.  After a hearing, the trial court denied the motion, and Todd pled guilty to the charge.  A jury assessed Todd's punishment, and she was sentenced to twelve years' imprisonment and ordered to pay a $10,000 fine.  On appeal, Todd contends that the trial court abused its discretion by denying her motion to suppress.  We will affirm the judgment.

## BACKGROUND

At the suppression hearing, State Trooper Alejandro Morante was the only witness to testify, and the State admitted bodycam videos from Trooper Morante and his partner, Trooper Colton Wilson. The evidence at the suppression hearing established that Troopers Morante and Wilson were patrolling FM 765 near San Angelo at about 11 p.m. on December 20, 2023, when they observed Todd driving toward them going 82 miles per hour in a 75-mile-per-hour zone. Trooper Wilson activated the patrol car's lights and attempted a traffic stop, but Todd's "vehicle took an abnormally long time to pull over," and "when it eventually did, it made a hard jerking motion to the right and then it did come to a stop." With the cars parked on the side of the road, Trooper Morante approached the passenger side of Todd's truck, noting that to "maintain our safety," he was "looking through the vehicle, clearing the vehicle, making sure there's no weapons or anything." "I observed a couple of dogs, the defendant Ms. Todd, as well as a glass bottle of syringes that was on – underneath her feet on the driver's side of the floorboard." Trooper Morante shined his flashlight on the bottle, which "looked like it was an empty hot sauce bottle or something," and "there was numerous syringes in there" with "some of them [that] looked different than the others" and "the plunger was pulled back."

Trooper Morante asked Todd for her driver's license and "observed that she had slow and sluggish movements." Todd said "that she was sorry for speeding" and did not have a driver's license or the car's registration because she was driving her father's truck. Trooper Morante asked Todd to get out of her vehicle and remain with Trooper Wilson while he returned to the patrol car to conduct a computerized check on the mobile dispatch terminal with the information she provided. In the system, Trooper Morante learned that Todd did not have a valid driver's license, "had a previous incident with DPS, about six months earlier, involving two

2

narcotic charges," and "had been arrested for narcotics in the past." "It was a PG-1, so it could be meth, heroin, coke." Though Trooper Morante acknowledged that people have syringes for legitimate reasons, like insulin for diabetics or progesterone for IVF patients, those are typically chilled and "in a little package" or "in a safe container." "I had a very good idea that more likely than not that what was inside that glass bottle in those syringes was going to be liquid meth, so I went and I spoke with Ms. Todd and I asked her when was the last time she had used meth or heroin." Todd said "that she did get arrested for meth" but "stated there was nothing in the syringes" and that she did not have "any type of meth on her person." Trooper Morante went back to the driver's side of Todd's vehicle. "I looked and I could see that those syringes that were different than the others with the – with most likely the plunger pulled back, that there was a clear liquid substance inside of those syringes." And the bottle had "an opening that the syringes could come out of – from the top of the bottle, from the side of the bottle."

Trooper Morante asked Todd if he could search the vehicle, but Todd said no, so Trooper Morante contacted a DPS K-9 unit to conduct an exterior sniff of the vehicle. Trooper Morante expected the K-9 unit to arrive in about fifteen minutes. While he was calling the K-9 officer, "Trooper Wilson came to me and he explained that he believed whatever the substance was going to be was going to be on her person due to her behavior. She was clinched" and "stiff." "A lot of times when people hide contraband on their person they try to clinch their legs or clinch their buttocks to try to prevent any contraband from falling down and making it visible to us." Even though "it was a cooler night and there was dew on the ground," Todd "wanted to sit down on the ground, which is not common."

Trooper Wilson continued to speak with Todd while they waited for the K-9 unit, and "at some point during that conversation, she said that there was a little bit of marijuana inside

3

the car." Trooper Morante asked Todd "if she believed that she needed to tell us that there was marijuana inside the vehicle because a K-9 was coming or if she wanted to tell us that to not cause a bigger scene," and Todd said it was "just to get it over with. I don't want to cause a bigger scene." At that point, Trooper Morante said that "based on the totality of the traffic stop I believed there was probable cause to conduct a probable cause search of the vehicle." Trooper Morante testified that "during my time as a trooper I have come into numerous traffic stops where people possess liquid meth inside of syringes. When I saw the syringes that were in the glass bottle, when I first made my traffic – when I first made the approach, I believed that it was more likely than not that inside the syringes was going to be liquid meth."

While searching Todd's vehicle, Troopers Morante and Wilson found "numerous used syringes," "loaded syringes of that clear liquid substances and the numerous unused syringes," "Alprazolam, Xanax," "a drug ledger," and the marijuana Todd mentioned. Trooper Morante conducted a field test of the liquid inside the syringes, which was positive for methamphetamine. As Trooper Wilson placed Todd in handcuffs, he "heard a crunching sound" in her pant leg, which they discovered was a bag with "a lot of meth in there" with a field weight of 204 grams.

The trial court denied Todd's motion to suppress, and she pled guilty to the charge. After a two-day punishment trial, Todd was sentenced to twelve years' confinement in TDCJ and a fine of $10,000. The trial court entered findings of fact and conclusions of law regarding its denial of the motion to suppress. Todd appeals.

4

## STANDARD OF REVIEW

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). In general, appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *See State v. Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see also Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and demeanor"). "The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). When, as here, the trial court makes explicit findings of fact, we decide whether the evidence viewed in the light most favorable to the court's decision supports the findings. *State v. Garcia*, 569 S.W.3d 142, 153 (Tex. Crim. App. 2018).

## DISCUSSION

In one issue on appeal, Todd argues that the trial court abused its discretion by denying her motion to suppress. She maintains that Trooper Morante prolonged the traffic stop and "shifted, on a hunch, to a fishing expedition" for "unrelated criminal drug activity." Because

Todd contends that Trooper Morante lacked reasonable suspicion to shift from a traffic stop to a narcotics investigation, she argues that her prolonged detention violated her Fourth Amendment rights and thus the trial court should have granted her motion to suppress the fruits of that unlawful detention. *See* U.S. Const. amend. IV.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In such cases, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). A seizure justified only by a traffic violation becomes unlawful if prolonged beyond the time reasonably required to conduct the traffic stop. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017) (citing *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015)). Thus, continuing a brief investigatory detention beyond the time necessary to conduct a traffic stop requires reasonable suspicion of criminal activity apart from the traffic violation. *Id.*

"Reasonable suspicion exists if the officer has specific articulable facts that, combined with rational inferences from those facts, would lead the officer to reasonably conclude the person is, has been, or soon will be engaged in criminal activity." *State v. Hardin*, 664 S.W.3d 867, 872 (Tex. Crim. App. 2022). "This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists." *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). In assessing whether reasonable suspicion exists, a reviewing court may consider an officer's ability to "draw on [his] own experience and specialized training to make inferences from and deductions about the

6

cumulative information available to [him] that 'might well elude an untrained person.'" *Ramirez-Tamayo*, 537 S.W.3d at 36 (quoting *Arvizu,* 534 U.S. at 273). Similarly, a reviewing court must give "due weight" to factual inferences drawn by local judges and law enforcement officers. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699, (1996)).

Appellate courts must consider "the totality of the circumstances" when determining the question of reasonable suspicion. *Ford*, 158 S.W.3d at 492–93. "Although the individual circumstances may seem innocent enough in isolation, if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Ramirez-Tamayo*, 537 S.W.3d at 36 (citing *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013), *abrogated in part on other grounds by Lall v. State*, 686 S.W.3d 766 (Tex. Crim. App. 2024)). "It is enough to satisfy the lesser standard of reasonable suspicion that the information is sufficiently detailed and reliable—*i.e.*, it supports more than an inarticulate hunch or intuition—to suggest that something of an apparently criminal nature is brewing." *Derichsweiler v. State*, 348 S.W.3d 906, 917 (Tex. Crim. App. 2011). "The relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Id.* at 914. And a determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. *Ramirez-Tamayo*, 537 S.W.3d at 36 (citing *Leming v. State*, 493 S.W.3d 552, 565 (Tex. Crim. App. 2016)).

Todd does not challenge that Trooper Morante had reasonable suspicion to make a traffic stop, but she argues that Trooper Morante did not have reasonable suspicion to proceed from a traffic stop to a narcotics investigation. She maintains that Trooper Morante "had no more than a hunch" that was "based on his observation through the truck's windows of syringes that he admitted were legal to possess and knew had multiple legal uses that did not involve illegal

narcotics." She also emphasizes that she admitted to possessing marijuana in the vehicle "after she had already been unjustifiably detained beyond the scope of the traffic stop."

However, here, the suppression determination largely turned on Trooper Morante's credibility, and we must defer to the trial court's findings crediting his testimony, which are supported by the record. *See Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019) ("A trial court's findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor are afforded almost total deference if they are reasonably supported by the record."). The trial court also reviewed Trooper Morante's and Trooper Wilson's bodycam videos admitted as evidence at the suppression hearing that bolster Trooper Morante's testimony.

The record supports the trial court's findings of fact that Trooper Morante "observed that [Todd] had slow, sluggish movements and slurred speech," that he "observed a glass bottle underneath [Todd's] feet in the floorboard," and that "the bottle had no lid on it" and "contained numerous syringes," including some with "plungers pulled back as if containing a substance." The record also supports the trial court's findings regarding Trooper Morante's experience with similar circumstances, including that he "has had numerous traffic stops where he has observed liquid methamphetamine in syringes" and that while he "is familiar with situations in which individuals transport insulin or other medications in syringes, [] carrying syringes in an open glass used bottle is not something he has seen previously," and "[a] floorboard under a driver's feet is not a reasonable or customary place that a person travelling with an injectable medication would place it." And the record supports that after Todd indicated that she did not have a driver's license or registration, Trooper Morante learned by running a computer check that Todd had recent "criminal charges related to controlled substances" and "had been arrested for possession of methamphetamine less than a year earlier." Further, the record supports the trial

8

court's findings that Trooper Morante's initial interaction with Todd, during which he made the above observations and asked for Todd's license and car registration, lasted approximately two-and-a-half minutes before he returned to the patrol car, and that it took just under two minutes for him to check Todd's information on his mobile dispatch terminal, immediately after which Trooper Morante again looked through Todd's window and observed "the clear liquid substance inside of those syringes." The record confirms that these observations all occurred before Todd declined to have her vehicle searched, *cf. Lall*, 686 S.W.3d at 768, or admitted to having marijuana in the car.

Viewed in the light most favorable to the ruling, the evidence supports the trial court's findings that Trooper Morante had the training and experience to make him reasonably capable of rationally suspecting that Todd was in possession of illegal drugs based on the totality of the circumstances that he observed during the traffic stop. *See Ramirez-Tamayo*, 537 S.W.3d at 38. Trooper Morante was still actively involved in the traffic stop when he noticed Todd's "sluggish" movements, observed the syringes with the plungers pulled back on the floor of Todd's vehicle, and discovered her recent drug-related arrests. *See Lerma v. State*, 543 S.W.3d 184, 194 (Tex. Crim. App. 2018). Based on the totality of the circumstances, the trial court could have reasonably determined that Trooper Morante articulated an objective basis—not merely a "hunch"—based on multiple factors for his reasonable suspicion that led him to prolong the detention from a traffic stop to a narcotics investigation. *See Ramirez-Tamayo*, 537 S.W.3d at 38–39. Thus, the trial court did not err in denying Todd's motion to suppress, and we overrule Todd's sole issue on appeal.

## CONCLUSION

We affirm the judgment of conviction.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed:   May 21, 2026

Do Not Publish