

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00295-CR

Joshua **CASAREZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2021CR4739
Honorable Jefferson Moore, Judge Presiding

Opinion by:      Liza A. Rodriguez, Justice

Sitting:          Patricia O. Alvarez, Justice
                 Liza A. Rodriguez, Justice
                 Lori I. Valenzuela, Justice

Delivered and Filed: April 30, 2024

AFFIRMED

After a jury trial, Joshua Casarez was found guilty of possession of four to two-hundred grams of methamphetamine and was sentenced to eighteen years of imprisonment. On appeal, he argues the trial court erred by failing to grant his motion to suppress and by refusing to include a jury instruction pursuant to article 38.23 of the Texas Code of Criminal Procedure. We affirm.

## BACKGROUND

In his motion to suppress, Casarez sought to suppress evidence seized during a warrantless search and seizure, arguing that the police officers lacked reasonable suspicion to stop the vehicle

in which he was a passenger and lacked probable cause to detain him or search his person or the vehicle. Casarez argued the evidence was seized in violation of the Fourth Amendment to the Constitution, article I, section 9 of the Texas Constitution, and article 38.23 of the Texas Code of Criminal Procedure. The two arresting officers testified and footage from the officers' body cameras were introduced in evidence.

Officer Joseph Flores testified that on January 14, 2021, he was assigned to San Antonio Police Department's Street Crimes Unit, which patrols high crime areas in San Antonio, and was working with his partner, Officer Ashley Gerken. They were on patrol in a stealth black police vehicle with subdued lettering. At 1:00 a.m, Officer Flores noticed a four-door sedan did not have a working license plate light and stopped the vehicle for the violation. Officer Flores approached the driver's side of the vehicle while Officer Gerken approached the passenger's side. Officer Flores saw that there was a passenger in the sedan sitting directly behind the driver. Officer Flores told the driver the reason he had been stopped and asked to see a valid driver's license. The driver replied that he did not have a valid driver's license. Officer Flores explained that driving without a valid driver's license is an offense for which one can be arrested. Thus, Officer Flores asked the driver to step out of the vehicle, and the driver complied.

Officer Flores testified that when the driver opened the door and stopped out, he could see a "walkie-talkie and . . . the handle of what appeared to be a blade in between the console and the seat—the front driver's seat." Officer Flores explained that when he said "blade" he meant a knife—he just could not see the entire knife. When asked where the walkie-talkie was located, Officer Flores replied, "Directly under his lap." Officer Flores testified that based on his training and experience, having a walkie-talkie in that manner at 1:00 in the morning is unusual and could indicate the driver was "making narcotics deals," was "stealing vehicles," or "getting into vehicles

and burglarizing vehicles." Officer Flores then patted down the driver for weapons and took him to the front of the vehicle.

According to Officer Flores, while he was patting down the driver, Officer Gerken moved from the passenger's side of the vehicle to the driver's side where Appellant Casarez was sitting in the back seat. Officer Gerken told Casarez to get out of the vehicle because she saw in the vehicle "baggies [and] a torch lighter, which are commonly used and known" tools for narcotics. Officer Flores testified that Officer Gerken was trying to get Casarez out of the vehicle because "it was a safety issue" and the knife in the vehicle was "still within reach" of Casarez. Casarez was not compliant and "kept questioning the reason why." Officer Flores testified he and Officer Gerken "both took him out of the vehicle." When Casarez got out of the sedan, Officer Flores saw another walkie-talkie, the same kind as the driver. Officer Flores testified that when he saw Casarez sitting in the back of the sedan with no other occupants, he was concerned "because if they [are] both on one side, it makes it easily accessible for one to approach and for one to exit the vehicle quickly." Officer Flores testified both the driver and Casarez having the same type of walkie-talkie indicated that "they were out doing illegal things." Officer Flores explained, "Like I said, it could be a number of things as far as what we call—or what is called—to rob somebody is called a 'lick' out on the streets. The slang name is to do a 'lick.' And that was what gave me that initial reason that that's what they were doing."

Officer Flores testified that after getting Casarez out of the vehicle, he patted down Casarez for weapons. Officer Flores did not find any weapons, but he did feel the contour of a gun holster on Casarez's right thigh underneath his pants, which made Officer Flores think there was "possibly a weapon somewhere." Officer Flores asked Casarez if there was a gun, and Casarez replied that there was not.

Officer Gerken testified similarly to Officer Flores. According to Officer Gerken, when she first approached the passenger-side of the four-door sedan, she saw the driver and Casarez sitting in the backseat behind the driver. Officer Gerken testified,

> Immediately upon approaching . . . the vehicle, I observed what appeared to be a torn-off baggie in the front seat. I also observed torch lighters. And those two items in my training and experience are commonly used with methamphetamine use. Also, I observed a walkie-talkie that the driver had and a scope that was sitting right next to [Casarez]. At that point I believed that those were tools to a crime in robberies.

Officer Gerken explained that she could see the baggie "protruding from another bag" and that "[i]t appeared that the corner had been torn off." The baggie was in the middle of the backseat near Casarez. She testified, "In my experience with the narcotics cases, the appearance was that it was bitten off, which is used—people do that to conceal illegal narcotics from officers." The torch lighters "are butane torch lighters" that make it "much easier to heat up drug paraphernalia." Officer Gerken testified that because of the scope she saw in the sedan, she moved to the driver's side of the sedan to make contact with Casarez. She explained that she did not know at that point whether "there was a rifle attached to that rifle scope that [she] observed." She wanted Casarez "to be removed from the vehicle until [she] could retrieve the firearm." Officer Gerken testified that she was concerned about officer safety, and that she believed at that point the driver and Casarez were "involved in robberies." According to Officer Gerken, in her experience, robberies can be associated with drug dealing: "People that use narcotics will tend to need that quick money, that quick cash, so they'll conduct a robbery for cash or assets and turn around and sell it so they can have money for narcotics."

Officer Gerken testified that she made contact with Casarez and asked him to get out of the vehicle, but he was not cooperative. When Casarez got out of the backseat, Officer Gerken saw the second walkie-talkie, which was lying on the seat where Casarez had been sitting, and a pair

of binoculars. Officer Gerken testified that both the walkie-talkie the driver had and the walkie-talkie Casarez had were tuned to the same channel. According to Officer Gerken, Officer Flores then searched Casarez and found an empty holster strapped to Casarez's leg, which raised Officer Gerken's suspicion that a firearm was nearby. Thus, at this point, Officer Gerken and Officer Flores had observed at 1:00 in the morning, two men sitting in an unusual formation in vehicle (which would allow for quick ingress and egress), two walkie-talkies near each man (which were turned on and tuned to the same channel), a rifle scope within reaching distance of Casarez, binoculars, a knife in the front console, an empty holster strapped to Casarez's thigh, torn-off baggie in the backseat, and torch lighters in the front seat. Officer Gerken testified that all of these circumstances formed her belief that some type of criminal activity was afoot. Officer Gerken explained,

> In my experience and training, with robberies, people use walkie-talkies to communicate back and forth. They use scopes and binoculars to look from a distance for victims of opportunity. . . . Once they identify a victim, one person will get out of the vehicle, somebody other than the driver, they'll go conduct the robbery and communicate back and forth on the walkie-talkies to coordinate a pick-up.

She also checked whether the driver and Casarez had any outstanding warrants and determined that Casarez was a convicted felon. She then conducted a search of the vehicle.

Officer Gerken started her search in the backseat where she had seen the torn-off baggie and the rifle scope. She "quickly determined that there was no rifle attached to the scope and that [the] baggie was, in fact, torn and empty." She gathered the tools she believed were tools of robbery, including "the binoculars, the scope, [and] the walkie-talkies." She then searched a "pillow case that [Casarez] [had been] sitting on and . . . pulled out rubber gloves." She continued her search and saw "a loaded revolver," which was consistent with the holster that Casarez had been wearing. She then went to the opposite side of the backseat and began to search where the

baggie had been. "In a brown paper-like bag, [she] found several grams of a crystal-like substance, which tested positive for methamphetamine." She also found "marijuana roach joints," "pills that appeared to be Xanax, which were later confirmed as Alprazoiam," a scale, and about $600 in cash. In the same bag Officer Gerken found the drugs, she also found Casarez's wallet and his Texas ID card. In another bag in the backseat, Officer Gerken found the loaded revolver. Because she knew Casarez was a felon, she knew he was not allowed to lawfully carry a firearm. There "was one casing in the cylinder," which indicated it had been fired. The methamphetamine found had a field weight 37 grams.

Officer Gerken testified that in the front seat of the sedan, she found a cell phone that the driver had been using for directions. Officer Gerken testified the driver could have used that phone if he needed to communicate with someone and did not need to use a walkie-talkie. The driver was issued a citation for not having a driver's license and for not having a license-plate light. Casarez was arrested for possession of the firearm as a convicted felon and possession of methamphetamine with intent to deliver.

At the end of the hearing, the trial court denied the motion to suppress. The case then proceeded to trial. During the charge conference, Casarez requested a jury instruction pursuant to article 38.23, which the trial court denied. Casarez now appeals.

MOTION TO SUPPRESS

*A. Standard of Review*

We review a trial court's ruling on a motion to suppress using a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). First, we give almost total deference to the trial court's factual determinations. *Id*. The trial court "is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony." *Id*. The trial court "is entitled to believe or disbelieve all or part of a witness's testimony—even if that

testimony is uncontroverted—because" it is the trial court that has the opportunity to observe a witness's demeanor and appearance. *Id*. Second, we review de novo a trial court's application of law to the facts, and we will affirm a ruling that is "reasonably supported by the record and is correct on any theory of law applicable to the case." *Id*. at 447-48. Thus, when reviewing a trial court's "decision to deny a motion to suppress where probable cause to search was challenged," we must "afford almost total deference to a trial court's express or implied determination of historical facts and review *de novo* the court's application of the law of search and seizure to those facts." *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007) (citations omitted) (emphasis in original). When, as here, the trial court does not make explicit factual findings, we "view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Id*. (citations omitted).

### B. Initial Stop and Pat-Down

The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. CONST. amend. IV; *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011). "Under the Fourth Amendment, a brief investigatory detention must be justified by reasonable suspicion." *Matthews v. State*, 431 S.W.3d 596, 602-03 (Tex. Crim. App. 2014) (citations omitted). "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)) (other citations omitted). "This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention." *Id*. We also look to the totality of the circumstances; "those circumstances may all

seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Id*. In other words, we focus on "whether the totality of [the] reliable information provided specific, articulable facts that, combined with reasonable inferences derived from those facts, would lead to the reasonable conclusion that the appellant was committing, or soon would be engaged in, some type of criminal activity." *Id*. at 915-16.

Upon lawful arrest, the search of the person is justified by the need to assure officer safety and the need to protect evidence from concealment or destruction without any need for a particularized showing that weapons or evidence are likely to be found. *See Price v. State*, 662 S.W.3d 428, 433 (Tex. Crim. App. 2020) ("Searches of the person, or of property within the *immediate* control of the person—property immediately associated with the person of the arrestee—are always justified under the search incident to arrest exception to the warrant requirement, upon no more justification than the arrest itself.") (citation omitted).

"In the context of a traffic stop, police officers are justified in stopping a vehicle when the officers have reasonable suspicion to believe that a traffic violation has occurred." *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). "A traffic stop made for the purpose of investigating a traffic violation must be reasonably related to that purpose and may not be prolonged beyond the time to complete the tasks associated with the traffic stop." *Id*. "During a traffic stop the officer may request certain information from a driver, such as the driver's license, vehicle registration, and proof of insurance, and run a computer check on that information." *Id*. "An officer is also permitted to ask drivers and passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop." *Id*. "[I]f an officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal

activity the officer may continue questioning the individual regardless of whether the official tasks of a traffic stop have come to an end." *Id*. at 191.

Further, "[d]uring the course of a detention, an officer may, in certain circumstances, conduct a pat-down search of an individual to determine whether the person is carrying a weapon." *Id*. "In order to justify a pat-down, the officer must reasonably believe that the suspect is armed and dangerous, such that the officer can point to specific and articulable facts which reasonably lead him to conclude that the suspect might possess a weapon." *Id*. "Reasonable suspicion in this context is based on an objective assessment of the officer's actions in light of the facts and circumstances surrounding the detention." *Id*. "The officer's subjective level of fear is not controlling." *Id*. "The question is whether a reasonably prudent person would justifiably believe that his safety or the safety of others was in danger." *Id*.

The record reflects that the officers stopped the vehicle in which Casarez was a passenger because the vehicle's license plate light was not working, which is a violation of section 547.322(f) of the Texas Transportation Code. *See* TEX. TRANSP. CODE § 547.322(f) (requiring a "taillamp or a separate lamp" to be "constructed and mounted to emit a white light that: (1) illuminates the rear license plate; and (2) makes the plate clearly legible at a distance of 50 feet from the rear"). Thus, the officers had reasonable suspicion to conduct the traffic stop. *See Lerma*, 543 S.W.3d at 190.

The record further reflects that when Officer Flores approached the vehicle, he saw Casarez was sitting in the back seat behind the driver, which was an unusual seating pattern because no one else was in the vehicle. The driver told Officer Flores that he did not have a valid driver's license, and Officer Flores asked the driver to step out of the vehicle. When the driver opened the door and stepped out, Officer Flores saw a walkie-talkie, which had been underneath the driver's lap, and the handle of a knife in between the console and the front driver's seat. Officer Flores testified that in his experience and training, the walkie-talkies, the unusual seating pattern, the

possible weapon, and the fact that it was 1:00 a.m. in the morning was suspicious and could indicate the driver was "making narcotics deals," "stealing vehicles," or "getting into vehicles and burglarizing vehicles."

The record further reflects that when Officer Gerken approached the vehicle, she saw a torn-off baggie and torch lighters, which she testified are commonly used and known tools for narcotics. Officer Gerken also saw a walkie-talkie next to Casarez in the back seat, which was the same kind as the driver's walkie-talkie, and a rifle scope, which she was not sure whether was attached to a rifle. Both the rifle scope and the knife handle in the middle console of the vehicle were within Casarez's reach. Officer Gerken testified that she wanted Casarez removed from the vehicle for her safety and that she believed at that point the driver and Casarez could possibly be "involved in robberies."

Under our standard of review, the record supports an implicit finding by the trial court that the officers had reasonable suspicion to believe their safety might be in danger and thus could instruct Casarez to exit the vehicle and conduct a pat-down search. *See Lerma*, 543 S.W.3d at 191-92 (holding evidence supported implicit finding by trial court that officer had reasonable suspicion to believe his safety or the safety of others was in danger and thus could conduct pat-down search of passenger following traffic stop); *see also Graham v. State*, 893 S.W.2d 4, 7 (Tex. App.—Dallas 1994, no pet.) ("As part of [a] temporary detention, an officer may ask that an individual step out of the automobile.").

*C. Search of the Vehicle*

A passenger may challenge the search of a vehicle in which he was a passenger "*if* the search resulted from an infringement (such as an illegal detention) of the *passenger's* Fourth Amendment rights." *State v. Crisp*, 74 S.W.3d 474, 480 (Tex. App.—Waco 2002, no pet.) (quoting *Lewis v. State*, 664 S.W.2d 345, 348 (Tex. Crim. App. 1984)) (emphasis in original). Thus, if a

passenger's "Fourth Amendment rights were violated because he was illegally detained or illegally arrested, he would have standing to contest the search of the car." *Id*. As noted above, we have determined the vehicle's detention and Casarez's pat-down search was lawful.

Moreover, even if Casarez had standing, the officers had probable cause to search the vehicle. A warrantless search of a vehicle is reasonable if the officers have probable cause. *See Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). "Probable cause requires an evaluation of probabilities, and probabilities 'are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id*. (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "The United States Supreme Court has described probable cause as a 'fluid concept [ ]'; its 'substantive content' is derived from 'the particular context[ ] in which' it is assessed." *Id*. (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "Probable cause 'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *Id*. (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "When determining probable cause, an appellate court considers the totality of the circumstances." *Id*. at 25. "This means that a 'divide-and-conquer' or piecemeal approach is prohibited." *Id*. "The subjective intent or motivations of law enforcement officials is not taken into account when considering the totality of the circumstances." *Id*. "But the training, knowledge, and experience of law enforcement officials is taken into consideration." *Id*.

When Officer Flores conducted the pat-down search of Casarez, he felt an empty gun holster strapped to Casarez's thigh underneath his pants. Thus, at the time Officer Gerken searched the vehicle, the officers had stopped a vehicle at 1:00 a.m. in a high-crime area. They had observed the driver and passenger sitting in an unusual formation—a formation that would make it easy "for one to approach and for one to exit the vehicle quickly." They saw walkie-talkies near both the driver and Casarez, which were turned on and tuned to the same channel. Officer Flores testified

that both the driver and Casarez having walkie-talkies and sitting in the formation they did, indicated that "they were out doing illegal things." The officers also saw a torn-off plastic baggie, torch lighters, a knife sticking out in between the driver's seat and the center console, and a rifle scope in the backseat of the vehicle, which the officers testified were tools of narcotics and robberies. A pat-down search of Casarez produced an empty gun holster attached to his thigh. Officer Flores testified he was concerned where the gun that went in that holster was located. Officer Gerken then ran a search and determined that Casarez was a convicted felon who was not allowed to possess a firearm. Under the totality of these circumstances, the officers had probable cause to search the vehicle. *See Wiede*, 214 S.W.3d at 24 (explaining probable cause exists when a person of reasonable prudence would believe that contraband or evidence of a crime will be found). And, once Officer Gerken found in the back seat the loaded revolver (which was consistent with the holster Casarez was wearing), the methamphetamine, and Casarez's Texas identification card (which was in the same bag as the methamphetamine), she had probable cause to arrest Casarez for possession with intent to deliver a controlled substance and for being a felon in possession of a firearm.

Casarez would thus have no standing to challenge the officers' search of the vehicle based on an illegal detention or arrest. The only other way he could challenge the search of the vehicle was if he asserted a possessory interest in the vehicle. *See Morfin v. State*, 34 S.W.3d 664, 666 (Tex. App.—San Antonio 2000, no pet.) (explaining a passenger does not have a legitimate expectation of privacy in a vehicle if he fails to assert a possessory interest in the vehicle). However, there is nothing in the record to indicate that Casarez asserted any possessory interest in the vehicle. Indeed, State's Exhibit 4, which is video footage from Officer Gerken's body camera, reflects the opposite. The body cam footage shows Officer Gerken asking the driver of the vehicle whether she would find anything illegal when she searched it. The driver replied that he had "no

idea" and that he had "just picked [Casarez] up." Therefore, Casarez has no basis to assert standing to challenge the vehicle search based on a possessory interest in the vehicle. *See Morfin*, 34 S.W.3d at 666.

We therefore hold the trial court did not err in denying Casarez's motion to suppress.

## ARTICLE 38.23 INSTRUCTION

In his second issue, Casarez argues the trial court erred in refusing his request to give a jury instruction pursuant to article 38.23 of the Texas Code of Criminal Procedure. We review a claim of error in the jury charge under the standard enunciated in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). We first determine whether the charge contains error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error is present, we determine whether it is harmless under the applicable standard. *Id*. at 743-44.

"A defendant's right to the submission of jury instructions under [a]rticle 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible." *Madden v. State*, 242 S.W.3d 504, 509-10 (Tex. Crim. App. 2007). "[W]hen an issue of fact is raised, a defendant has a statutory right to have the jury charged accordingly." *Id*. at 510 (citation omitted). "The only question is whether under the facts of a particular case an issue has been raised by the evidence so as to require a jury instruction." *Id*. (citation omitted) "Where no issue is raised by the evidence, the trial court acts properly in refusing a request to charge the jury." *Id*. (citation omitted).

Therefore, before a defendant is entitled to the submission of a jury instruction under article 38.23(a), a defendant must meet three requirements:

(1) The evidence heard by the jury must raise an issue of fact;
(2) The evidence on that fact must be affirmatively contested; and
(3) That contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence.

*Id.* "There must be a genuine dispute about a material fact." *Id.* "If there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law." *Id.* "And if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence." *Id.* "The disputed fact must be an essential one in deciding the lawfulness of the challenged conduct." *Id.*

In support of his argument that the evidence raises an issue of fact, Casarez argues "the instant record contains evidence from which a jury could find that, on January 14, 2021, [Casarez] was both illegally arrested and improperly searched (and not merely detained and frisked)." He argues that "[f]rom these facts, alone, a properly instructed jury could find the seizure and searches that happened . . . were unreasonable." As described above, we disagree that the record reflects Casarez was illegally arrested and improperly searched.

Additionally, Casarez points to Officer Gerken's body cam footage where Officer Gerken, about five minutes into her search of the vehicle and after she found the firearm in the backseat, told Casarez that she was going to start a search because she has probable cause to believe that narcotics were in the vehicle. Casarez argues that Officer Gerken's statement in the body cam footage was different than her testimony at trial, and thus a fact issue exists about the legality of the search. In support of his argument, Casarez points to the "following colloquy" by her defense counsel at trial:

> Your Honor, I'm requesting a[n] [article] 38.23 . . . [because] Officer Ashley Gerken's testimony . . . [was that] she had probable cause to search before the search began. On the body worn camera video that was introduced into evidence by the State, she makes the statement after her search began, about five minutes into her search and after she finds a handgun, she makes a statement to the defendant that she is going to begin or is going to start a search because she has probable cause to believe that narcotics are in the vehicle. So those two statements are in dispute. One statement is, "I had probable cause before I started searching the car," and the other statement is on the video, "I am now going to begin a

probable cause search," which occurred about five minutes after the search began. That would violate the law because you cannot search something in order to gain probable cause for a search. That is an issue of fact for a jury to determine, Your Honor.

In response, the State points out that Casarez's description of this moment on Officer Gerken's body cam footage is made "within the context of [Casarez]'s broader—and incorrect—argument that the jury could answer the legal question of whether the vehicle search was reasonable." We agree with the State.

The record reflects that Officer Gerken had probable cause to search the vehicle before she began the search, and her body camera footage makes the sequence of events clear. Her body cam footage reflects that she runs Casarez's name on her computer before she conducts the search. Before she conducted the search of the vehicle, she knew that Casarez was a convicted felon based on running his name. The body cam footage further reflects that Officer Gerken begins to search the vehicle, starting in the backseat, and after searching for a few minutes, she leaves the vehicle, hands Officer Flores a handwritten note, and stands with Casarez while Officer Flores goes back to the patrol vehicle. Officer Gerken tells Casarez that they are calling another unit. In response to a comment made by Casarez, Officer Gerken states she is going to conduct a probable cause search of the vehicle for illegal narcotics. Officer Gerken can then be heard a few minutes later telling another officer that she had already found the firearm but had not informed Casarez of that fact. Officer Gerken testified that she did not tell Casarez about finding the firearm because she did not want to escalate the situation.

Casarez argues that the evidence in this case raises a disputed issue of fact that is material to his claim of a constitutional or statutory violation that would render evidence inadmissible, because Officer Gerken testified at trial she had probable cause to search the vehicle before she started the search and is heard on the body cam footage telling Casarez she has probable cause to

search after she began the search. However, Officer Gerken's statements about having probable cause to search the vehicle are not material to Casarez's claim of a constitutional or statutory violation that would render evidence inadmissible. Officer Gerken's statements about probable cause to search are *legal conclusions*. Whether she, in fact, had probable cause to search is based on the totality of the circumstances that would warrant a man of reasonable prudence to believe that contraband or evidence of a crime will be found. *See Wiede*, 214 S.W.3d at 24. Officer Gerken's "subjective intent or motivation[] . . . is not taken into account when considering the totality of the circumstances." *Id*. And, her *opinion* about whether the legal standard of probable cause had been met does not create a material *factual* issue about the legality of the search. Thus, her opinion statements about probable cause are simply not relevant to the probable cause inquiry. *See Garza v. State*, 126 S.W.3d 79, 86 (Tex. Crim. App. 2004) (explaining that appellant disagreeing "with the conclusion that probable cause was shown as a matter of law is not the same as appellant controverting the *facts*" and that the "question of whether the search was legal is a question of law, as none of the circumstances surrounding the search were controverted by appellant") (emphasis in original). Casarez has not pointed to a contested *fact* that relates to whether the search was unlawful. *See id*. As noted above, we have described above the totality of *facts* that gave Officer Gerken probable cause to search the vehicle, and Casarez has not pointed to any of these facts as being in dispute. *See id*. Instead, Casarez points to Officer Gerken's trial testimony giving a legal conclusion about probable cause and to another statement made on her body cam footage regarding a legal conclusion about probable cause. This "discrepancy" simply does not create a fact issue with regard to whether the search, itself, was lawful. *See id*. Therefore, we find no error by the trial court in denying Casarez's request for a jury instruction pursuant to article 38.23.

**CONCLUSION**

For the reasons stated above, the judgment of the trial court is affirmed.

Liza A. Rodriguez, Justice

DO NOT PUBLISH