

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00149-CR

PAMELA MAUREEN GREENHILL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 276th District Court
Marion County, Texas
Trial Court No. F15533

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

Following a traffic stop in Marion County, State Trooper Brant Smith found methamphetamine underneath the driver's side of Pamela Maureen Greenhill's vehicle. After making the find, Smith got Greenhill to confess to her own activities and to assist in other investigations. Subject to a motion to suppress, Greenhill agreed to plead guilty[1] and to let the trial court determine her punishment. The trial court denied the motion to suppress, accepted the guilty plea, and sentenced Greenhill to twenty-five years' imprisonment. Greenhill now appeals and raises a single issue: whether the trial court properly denied her motion to suppress.

Greenhill urges that the road on which she was seen, followed, and stopped was private. Greenhill, therefore, contends that the road was not subject to enforcement of the Texas Transportation Code's "Rules of the Road."[2] Trooper Smith testified that he initiated the stop because he suspected Greenhill was driving without a license.[3] Hence, Greenhill's specific complaint is that she was not required to have a driver's license on the private road and that, therefore, Smith's basis for initiating the stop was improper.

---

[1]She pled guilty to delivery of a group 1 controlled substance in an amount of four grams or more but less than 200 grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(d) (Supp.).

[2]TEX. TRANSP. CODE ANN. §§ 541.001–600.004.

[3]TEX. TRANSP. CODE ANN. § 521.021 ("A person, other than a person expressly exempted under this chapter, may not operate a motor vehicle on a highway in this state unless the person holds a driver's license issued under this chapter."); TEX. TRANSP. CODE ANN. § 521.001(b) (Supp.) ("A word or phrase that is not defined by this chapter but is defined by Subtitle C has the meaning in this chapter that is assigned by that subtitle." (footnote omitted) (citation omitted)); TEX. TRANSP. CODE ANN. § 542.001 ("A provision of this subtitle relating to the operation of a vehicle applies only to the operation of a vehicle on a highway unless the provision specifically applies to a different place."); TEX. TRANSP. CODE ANN. § 541.302(5) ("'Highway or street' means the width between the boundary lines of a publicly maintained way any part of which is open to the public for vehicular travel.").

The State contends that the road where the stop was initiated is one of several in a lakeside development which have been open to the public for decades, such that (a) the road has long-since become subject to the "Rules of the Road" and (b) even if the road were still private, its longstanding public use means that Trooper Smith was not acting in flagrant disregard of Greenhill's rights. The State further contends that, if the stop were improper, events occurring before the eventual discovery of the methamphetamine—including the discovery that Greenhill's passenger had an outstanding warrant—constituted intervening circumstances that attenuated the taint, making it constitutionally permissible to admit the methamphetamine as evidence against Greenhill.

Regarding the road, the positions of the parties are fairly well developed. But the same cannot be said for the law, much less the facts. Though the development, Pine Harbor Subdivision, opened when Roger Staubach was the quarterback of the Dallas Cowboys,[4] this appears to be the first case to test whether Pine Harbor's roads are subject to the enforcement of the "Rules of the Road." Statewide, there have been few cases regarding whether an originally private road has become public for purposes of the "Rules of the Road" or, alternatively, whether a private neighborhood and a county have agreed to the enforcement of the "Rules of the Road."

In other words, Greenhill's "private road" argument could have implications beyond her own case.

Factually, the record includes a Marion County (County) map showing all the roads of Pine Harbor, including the road on which the events at issue occurred, Hideaway Loop. Some of

---

[4]An aside made apropos because the then-owner of the Cowboys, Clint Murchison, was the lead developer of Pine Harbor at its founding circa 1977.

the roads on the map are in bold, which indicates they are maintained by the County. Others, including Hideaway Loop, are not. But the record offers little explanation of how it came to be that some roads in Pine Harbor are maintained by the County, while others are not. Regardless of who maintains the roads, the State had the opportunity to present evidence of longstanding enforcement of the "Rules of the Road" in Pine Harbor. But this record contains no such evidence—no speeding tickets, no broken taillight citations, nothing. At oral argument, though, Greenhill allowed that there probably had been such citations issued, at least on the County-maintained roads of Pine Harbor. In any event, the State did bring forward evidence that the public, and law enforcement, had freely driven all the roads in Pine Harbor for years.

All-in-all, the record gives the impression that there has been a decades-long course-of-dealing regarding the roads of Pine Harbor, not all of which was given the solemnity of formal County action, whether regarding County maintenance of the roads,[5] or the County entering into an agreement with the development's residents to extend enforcement of the "Rules of the Road" into Pine Harbor.[6] As a result, this Court has some feel for how things are, but less of a feel for how things got to be that way.

So, we do not decide this appeal on the basis of Greenhill's "private road" argument.

One thing is undisputed: Trooper Smith discovered the methamphetamine *immediately after* he had given Greenhill a warning for driving without a license. In other words, the traffic

---

[5]*See* TEX. TRANSP. CODE ANN. §§ 281.001–.007.

[6]*See* TEX. TRANS. CODE ANN. § 542.007.

stop was over.[7]  The law on this is clear.  Searching Greenhill's vehicle again after the stop was over would have required a new justification.  But there was none.  Though this was not the focus of the parties' arguments, it is a matter "fairly included" within the issue of whether the under-vehicle methamphetamine should have been excluded.[8]

Upon review, we find that the trial court improperly denied Greenhill's motion to suppress and that this denial was harmful error.  As a result, we reverse and remand this cause to the trial court for further consideration consistent with this opinion.

## I.      Factual Background

On July 23, 2022, Greenhill was driving on Hideaway Loop in the Pine Harbor Subdivision in Marion County, Texas.[9]  Trooper Smith was patrolling that area and was on

---

[7]The State raised an attenuation of taint argument, but it concerned a different point in time in the stop, a point in time before the stop ended with the issuance of the warning.  The case the State argued in support of its attenuation of taint claim is *Massey v. State*, 667 S.W.3d 784 (Tex. Crim. App. 2023).  Under the attenuation of taint analysis in *Massey*, there are three factors to consider:  "(1) the temporal proximity between the misconduct and discovery of the evidence; (2) the presence of any intervening circumstances; and (3), the purpose and flagrancy of the police misconduct." *Id.* at 789 (citing *Utah v. Strieff*, 579 U.S. 232, 239 (2016)).  Under *Massey*, if we found the stop was illegal and also found the causal chain had been broken when the passenger's arrest warrant was discovered, that might attenuate the taint as to some evidence discovered after the causation chain was broken.  Such a search, however, necessarily has a limit in its scope.  The evidence in this case was found after the stop had ended with the issuance of the warning.  In other words, it was found after the start of a new timeline.  Hence, the continued search of Greenhill's vehicle after the warning raises a separate issue that must also be considered consistent with the precedent of the United States Supreme Court and the Texas Court of Criminal Appeals.

[8]We consider all issues raised in the brief as well as "every subsidiary question that is fairly included."  TEX. R. APP. P. 38.1(f).  Greenhill raised the issue of whether Article 38.23 requires exclusion of the methamphetamine found in a container under her vehicle.  Although the focus at oral argument and the briefing was the characterization of Hideaway Loop and any potential attenuation of taint, those questions also necessarily raise the issue of whether Trooper Smith's continued search of Greenhill's vehicle was constitutional.

[9]The body-camera footage of Trooper Smith's stop was admitted into evidence at the punishment stage of the trial.  During oral argument, the parties represented that the recording was introduced during the suppression hearing.  The record does not reflect such a finding.  However, in the trial court's findings of fact and conclusions of law, the trial court clearly had considered the body-camera footage as a part of the suppression hearing.  For example, the trial court found "[a]fter being given her [*Miranda*] Warnings, as stipulated by the defense, Defendant admitted to paying $400.00 for the methamphetamine and admitted to selling the methamphetamine in the area of Pine Harbor

5

Farm-to-Market Road 729, an adjoining road, when he saw Greenhill driving on Hideaway Loop. When Greenhill saw Smith, she backed up into her driveway, which Smith found to be suspicious. Smith knew Greenhill, was aware that she was on parole for manufacturing methamphetamine and was aware that she did not have a driver's license.

Trooper Smith pulled Greenhill over in front of her house at Hideaway Loop. The only reason he pulled her over was because he knew she did not have a driver's license. At the time Smith pulled Greenhill over, there were two occupants in the vehicle: Greenhill and a passenger, Jeffery Mitcham. After Smith pulled Greenhill over, he determined Mitcham had an outstanding warrant and arrested him. After Mitcham's arrest, Smith found methamphetamine on him and drug paraphernalia within "his immediate reach."

Trooper Smith then searched the vehicle, including the interior and the trunk of the vehicle. Smith did not testify whether Greenhill or Mitcham consented to the search of the vehicle. During the search of Greenhill's vehicle, Smith found nothing. As a result, Smith prepared to issue Greenhill a warning for driving without a license. Smith went back to his patrol car and prepared Greenhill's warning. According to the trial court's findings of fact and conclusions of law, Smith issued the warning:

> 4.      Trooper Brant Smith testified that he stopped defendant's vehicle because he recognized her and knew she was an unlicensed driver and that she was also on parole. Furthermore, once the Defendant spotted the Trooper, she turned her vehicle around in order to evade interaction with him. She was operating the vehicle on Hideaway Loop which is a public roadway in Marion County, Texas, *for which she was issued a warning.*

---

Subdivision in Marion County where her residence was located on Hideaway Loop." *See Miranda v. Arizona*, 384 U.S. 436 (1966). This was not included in the testimony at the suppression hearing but was included as part of the body-camera footage. Consequently, we will also consider the body-camera footage.

(Emphasis added).

After issuing the warning, Trooper Smith "went right to the driver's side and looked under the vehicle," took his "flashlight out and shined it[,] and grabbed a box that was stuck to the bottom of the vehicle." Smith testified that he looked there because, "[i]n the past few years, [he had] found stuff hidden in compartments underneath and inside the engine compartment of vehicles." Smith testified that he had not received any notification or "tip" from anyone else regarding the container, even though he did admit at the suppression hearing that he had been texting two individuals regarding Greenhill. After locating the box under her car, Smith "opened it up" and found what he "believed to be methamphetamine." Later, a laboratory report confirmed the amount of methamphetamine to be at least 12.87 grams.[10]

On November 18, 2022, Greenhill was indicted for "knowingly possess[ing], with intent to deliver, a controlled substance, namely, methamphetamine, in an amount, by aggregate weight, including adulterants or dilutants, four gram[s] or more but less than 200 grams." On April 28, 2023, Greenhill filed a motion to suppress, requesting the trial court to "suppress any and all evidence seized or obtained as a result of illegal acts on behalf of the Government in this criminal prosecution which violated the Defendant's rights as guaranteed to her under both the federal and state constitutions and under state statutes." The trial court held a hearing on that motion on May 11, 2023. After that hearing, the trial court denied Greenhill's motion to suppress. Greenhill then pled guilty and waived a jury trial, and the trial court sentenced her to

---

[10]The laboratory only tested that amount because the amount was clearly under 200 grams, which is the amount that would be required for the next level of the offense, but Greenhill admitted the total amount was around forty grams.

7

twenty-five years' imprisonment. On May 30, 2023, the trial court entered findings of fact and conclusions of law supporting its denial of suppression. Greenhill now appeals the trial court's denial of her motion to suppress, and she claims the trial court improperly denied her motion.

## II. Applicable Law

This is an appeal of the trial court's denial of a motion to suppress. As such, we apply a "bifurcated standard of review, giving almost total deference to a trial court's determination of historical facts and reviewing *de novo* the court's application of the law." *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002) (citing *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000)); *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996) (recognizing that, "as a general matter[,] determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal").

We also "give almost total deference to the trial court in determining what the actual facts are, and then we review de novo whether those facts are sufficient to give rise to reasonable suspicion." *Meadows v. State*, 356 S.W.3d 33, 36 (Tex. App.—Texarkana 2011, no pet.). Where a "trial court makes explicit findings of fact in ruling on a motion to suppress, a reviewing court views the evidence in the light most favorable to the trial court's ruling and determines whether the evidence, when viewed in that light, supports the fact findings." *State v. Smith*, 335 S.W.3d 706, 714 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (citing *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)).

**III.    Analysis**

The single issue Greenhill has raised is whether Article 38.23 of the Texas Code of Criminal Procedure requires suppression of the evidence obtained from the search of Greenhill's car. We find that it does.

**A.    Arguments of the Parties**

At the oral argument in this matter and in their appellate briefs, Greenhill and the State focused on the issue of whether the initial stop was illegal under Section 521.021 of the Texas Transportation Code. Under that provision, a driver is only required to have a license when operating "a motor vehicle on a highway in this state." TEX. TRANSP. CODE ANN. § 521.021.

Greenhill argues that, because Hideaway Loop is a private road, she was not required to have a driver's license while driving on that road. Greenhill claims that she was not violating the Texas Transportation Code and that the initial stop was illegal. In response to that argument, the State did not concede that Hideaway Loop is a private road; but the State argued that, even if Hideaway Loop were a private road, any taint from that potentially illegal stop was attenuated.

We have considered these arguments. Ultimately, in considering whether the evidence should be suppressed under Article 38.23 of the Texas Code of Criminal Procedure, we find the dispositive issue turns on whether the evidence was discovered before or after the initial reason for the traffic stop had ended. TEX. CODE CRIM. PROC. ANN. art. 38.23. Because we find the initial reason for the traffic stop had ended before the time Trooper Smith discovered drugs in a container attached under Greenhill's car, we will only consider the issue of whether Smith's search exceeded its permissible scope.

9

**B. The Basis for the Stop Had Ended at the Time Methamphetamine Was Discovered Under Greenhill's Car**

**1. Review of Applicable Caselaw**

The Texas Court of Criminal Appeals has found it unreasonable to continue a detention after a warning for a traffic violation has been issued. *St. George v. State*, 237 S.W.3d 720 (Tex. Crim. App. 2007). In *St. George*, two officers stopped a vehicle for having an inoperative license plate light, in violation of Section 547.322 of the Texas Transportation Code. *Id.* at 722. Once the officers initiated the stop, one of the officers asked the passenger his name, and the passenger initially gave the name of "John Michael St. George." *Id.* The officers ran the passenger's name and found "no record of a driver's license matching the name and date of birth given by Appellant." *Id.* One of the deputies then issued a warning ticket to the driver. *Id.* While one deputy was explaining the warning ticket to the driver, the other deputy continued to question the passenger. *Id.*

The questioning of the passenger continued for approximately ten minutes after the warning was issued to the driver. *Id.* Ultimately, during that questioning, the deputies discovered the passenger had misrepresented his name and his real name was Jeffrey Michael St. George. *Id.* The deputies ran his correct name, and they "found that Appellant had outstanding warrants for speeding and for not having insurance." *Id.* The deputies then arrested the passenger. *Id.*

The passenger appealed, arguing that the deputies "needed reasonable suspicion to continue questioning" him "after the initial reason for the stop concluded." *Id.* at 725. The Texas Court of Criminal Appeals agreed and found that the State had not "established the

10

reasonableness of the detention" as required by its precedent. *Id.* at 726. Importantly, it held the following:

> At the time the driver was issued the warning citation, the deputies did not have specific articulable facts to believe that Appellant was involved in criminal activity, thus, the questioning of Appellant regarding his identity and checks for warrants, without separate reasonable suspicion, went beyond the scope of the stop and unreasonably prolonged its duration.

*Id.* The court further stated that, although it "d[id] not intend to create a bright line rule that would automatically make an investigative detention unreasonable the moment that the initial reason for the traffic stop ends," in *St. George*, the officers failed to show reasonable suspicion to allow for the continued detention of the passenger. *Id.* at 727.

Eight years later, the United States Supreme Court addressed a similar issue in *Rodriguez v. United States*, 575 U.S. 348 (2015). In *Rodriguez*, a K-9 officer stopped a driver for illegally driving on the highway shoulder. *Id.* at 351–52. After checking the driver's licenses of Rodriguez and his passenger and issuing a warning for the traffic offense, the officer asked the driver for permission to walk his dog around the vehicle. *Id.* The driver refused, and the officer still walked his dog around the vehicle. *Id.* The dog alerted to the presence of drugs in the vehicle. *Id.* The United States Supreme Court found that allowing the dog to walk around the vehicle and alert for drugs violated the Fourth Amendment. *Id.* at 355. They held "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

11

In 2018, the Texas Court of Criminal Appeals again revisited the issue of whether a police stop was unconstitutionally unreasonable in length. *See Lerma v. State*, 543 S.W.3d 184 (Tex. Crim. App. 2018). In *Lerma*, the court distinguished *Rodriguez* and *St. George*, but did so in a way that showed the closeness of *Rodriguez* and *St. George* to the present case. *Id.* One of the facts in *Lerma* was that the evidence was obtained before the officer issued a citation or warning. *Id.* at 187–88. Given that fact, the Court distinguished both *Rodriguez* and *St. George* on grounds that those cases involved completed stops:

> We note that in *St. George* we stated that we did not intend to create a bright line rule that would automatically make an investigative detention unreasonable the moment a citation is issued. However, in both *St. George* and *Rodriguez* the officers had indicated to the driver that the traffic stop was complete, by issuing warnings and explaining those warnings to the respective drivers. In both cases, the continued detention, after it was made clear to the driver that the traffic stop was complete, was unreasonable.

*Id.* at 196 n.101 (citation omitted).

There are, though, some circumstances in which a search may continue after a traffic stop has ended. *Id.* at 191 ("[I]f an officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity[,] the officer may continue questioning the individual regardless of whether the official tasks of a traffic stop have come to an end."). Under such circumstances, "police may diligently pursue means of investigation likely to confirm or dispel their suspicions of other crime quickly, so long as they do not unnecessarily detain the driver." *Id.* at 195. For example, where an officer reasonably suspects the presence of illegal drugs, an officer may request the assistance of a K-9 unit and may detain the driver and

12

vehicle for a reasonable period of time even after the traffic stop has concluded. *See State v. Martinez*, 638 S.W.3d 740, 751–52 (Tex. App.—Eastland 2021, no pet.).

### 2. Application to Greenhill's Case

In Greenhill's case, Trooper Smith pulled Greenhill over for not having a driver's license. Based upon Smith's testimony and the body-camera footage, the stop was not a brief encounter. As outlined in further detail above, Smith had time to run a "warrants check" on Greenhill and Mitcham, arrest Mitcham, fully search the interior of the vehicle and the trunk, decide to issue a warning to Greenhill, prepare a warning for Greenhill, and complete the warning for Greenhill. The trial court found the warning was issued, and we defer to that factual finding. *See Maxwell*, 73 S.W.3d at 281.

Furthermore, while he was preparing that warning, Trooper Smith admitted he was texting one or two people regarding Greenhill, but he specifically denied that those text messages had any bearing on his discovery of the drugs under Greenhill's vehicle. The relevant exchange was as follows:

> Q ([By Greenhill)]: . . . [Y]ou were back in your car and you were getting those [warnings][11] ready; and before you did, you were texting back and forth with someone. Is that correct?
>
> A [(By Trooper Smith)]: Yes.
>
> Q Were you texting with someone that was giving you information related to Ms. Greenhill at that time?
>
> A Possibly.

---

[11]At the suppression hearing, that warning was at times characterized as "warnings." It appears, however, that it was only a single warning for driving with no driver's license.

13

Q      You mean -- possibly.  Who would you possibly be texting with regard to Ms. Greenhill?

A      I had contact with [name omitted] at one time.

Q      Okay.  And so you might have been texting with [name omitted] about -- at that point in time, about Ms. Greenhill?

A      That, and one of the deputies.

Q      Okay.

. . . .

Q      . . . . Did you receive messages that there might be something underneath the car?

A      No.

Trooper Smith testified to no specific, articulable facts to justify a continuation of the stop after the issuance of the warning.  Smith denied such particularized facts and instead made the generalized assertion, "In the past few years, I have found stuff hidden in compartments underneath and inside the engine compartment of vehicles."  That assertion could apply equally to the search prior to the issuance of the warning.  It is not a basis for the post-warning search.

In accordance with *St. George* and *Rodriguez*, and also consistent with *Lerma*'s discussion of those cases*,* we decide that, on the facts as found by the trial court, the additional post-stop search of the vehicle was unreasonable.  The State has not met its burden of establishing the reasonableness of the detention once the basis for the stop had ended and Greenhill was issued a warning.  *See Pham v. State*, 175 S.W.3d 767, 774 (Tex. Crim. App. 2005) (recognizing that, once the defendant, as the moving party, produces evidence of a causal connection between the police conduct and the evidence obtained, the "burden then shifts to the

14

State to either disprove the evidence the defendant has produced, or bring an attenuation-of-taint argument to demonstrate that the causal chain asserted by the defendant was in fact broken"). Even if Trooper Smith had a reasonable suspicion of criminal activity by Greenhill, the record of this case shows that Smith had decided to let Greenhill go with a warning, and did so.

### C.    The Error in Denying Suppression Was Harmful

Under Rule 44.2(a) of the Texas Rules of Appellate Procedure, "[i]f the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *see also Hernandez v. State*, 60 S.W.3d 106, 106–07 (Tex. Crim. App. 2001).

In the present action, the crux of the State's case was the discovery and ultimate admission of the methamphetamine discovered under Greenhill's car. Immediately after the trial court denied Greenhill's motion to suppress, Greenhill pled guilty. As a result, we find the error did contribute to the conviction or punishment, and we cannot find "beyond a reasonable doubt" that the error did not contribute to the conviction or punishment. Accordingly, consistent with Rule 44.2(a) of the Texas Rules of Appellate Procedure, we find harmful error.

## IV. Conclusion

Based upon our review, because we find harmful error in denying Greenhill's motion to suppress under Article 38.23, we reverse and remand this cause to the trial court for further consideration consistent with this opinion. *See* TEX. R. APP. P. 43.2(d).

Jeff Rambin
Justice

Date Submitted: July 10, 2024
Date Decided: August 21, 2024

Do Not Publish

16