**Affirmed and Memorandum Opinion filed October 10, 2024.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-23-00194-CR

---

**SAMUEL WAYNE WATTS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1684286**

---

## MEMORANDUM OPINION

Appellant Samuel Wayne Watts seeks reversal of his murder conviction following a plea bargain carrying a twenty-five year prison sentence. The sole issue on appeal relates to the trial court's denial of his motion to suppress custodial statements made while he was incarcerated on another matter. He argues his statements were secured by an improper two-step interrogation process in violation of protections against self-incrimination. Concluding that the trial court could have reasonably determined that the officer did not deliberately employ the two-step

interrogation process and that appellant's post-*Miranda* statements were made voluntarily, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant admitted in a jailhouse interrogation that he had assaulted Charles Ross. Ross subsequently died and the State charged appellant with Ross's murder. Appellant filed a pretrial motion to suppress his statements made during the interrogation. The evidence at the hearing was comprised of the testimony of the officer investigating appellant's case, Detective Justin Russell, and the audio recording of the interrogation.

*Hearing on Motion to Suppress*

At the hearing, Russell testified that he was assigned to investigate the assault of Charles Ross in August 2019. He confirmed that prior to speaking with appellant one witness reported that he saw appellant assault Ross but the witness later recanted that report. Additionally, a shovel police had discovered that was believed to have been the assault weapon had been tested for DNA; that test excluded appellant as a contributor.

Russell explained that he discovered that appellant was custody in the Harris County jail for another alleged assault, and that he requested to meet with appellant to interview him as a witness.

Russell testified about the circumstances and substance of his meeting with appellant. Russell was unarmed, in plain clothes, and met appellant at a table in a room used for both interviews and interrogations. Russell recalled appellant had been in jail on charges related to assaulting his brother, and explained it was his intention to interview appellant about the matter pertaining to Ross. Russell testified that he did not believe appellant to be "in-custody" for purposes of his

2

interview.

Appellant was escorted to the room, remained in shackles, and spoke to Russell in the room while the door remained open. Most of the interview was recorded, but Russell testified that before beginning the audio recording, he engaged in "some small talk beforehand that was unrelated." Russell recalled that appellant appeared "very relaxed, laid back." Russell compared his own demeanor on the day of the meeting to how he presented himself in court at the hearing, "just engaged and looking to obtain the story about an event." And though he does not recall telling appellant he was free to leave, he denied ever raising his voice or telling appellant he had to answer questions, and described the tone of the discussion as "conversational."

While Russell testified, the court admitted the audio recording, which was played at the hearing. The recording indicates that the entire interview lasted less than six minutes. In the recording, almost immediately after Russell introduces himself and explains to appellant that his reason for questioning appellant concerned the July assault of Ross, appellant stated, "I'm guilty." The trial court identified this portion, leading up to and including the statement, "I'm guilty," as "0:00 - 1:04" of the audio recording.

Russell acknowledged, and the audio recording reflects, that he continued to ask appellant a series of questions about details related to the assault—questions aimed to reinforce appellant's motive to protect or avenge his nephew, gain clarification about the assault, and confirm details on the location. Russell admitted that he deliberately asked these questions prior to giving him a *Miranda* warning:

> Q. So all 16 of those questions were deliberately asked specifically about . . . the allegations that you were investigating the moment you

3

sat down and spoke to Mr. Watts, correct?

A. That's correct.

Q. Then it was at that point after you essentially have a full confession that you decided to read Mr. Watts his warnings; is that accurate?

A. Yes.

This portion of the recording, the point immediately after appellant uttered, "I'm guilty," to the point that Russell read appellant his *Miranda* warnings, was identified by the trial court as "l:05 until 2:00" of the audio recording.

Russell testified (and the recording indicates) that Russell read appellant his *Miranda* warnings and that appellant waived his rights through assenting, nonverbal nods before the discussion continued.[1]

Russell conceded that his post-*Miranda* interrogation began by reference to the subject of appellant's nephew, who appellant mentioned in the pre-*Miranda* confession.[2] Notwithstanding, in the audio recording (consistent with appellant's transcription of it in his Brief), Russell's post-*Miranda* interrogation carried on independently without reference to appellant's previous confession.

During the post-*Miranda* interrogation, appellant explained that while

---

[1] The audio recording of the interview was not transcribed in the record. However, appellant, in his brief, provides an un-certified transcription of the audio recording, uncontested by the State, consistent with our review of the exhibit in the record. It shows that at the conclusion of his *Miranda* warnings and responses, appellant verbally responded:

Russell: Can you say it out loud just so the recording can hear it?

Appellant: What do I need to say?

Russell: I understand what the rights are.

Appellant: I understand what the rights are.

[2] Although there is no indication in the audio recording (or appellant's transcription of it in his Brief), that in the Post-*Miranda* discussion, Russell ever refers directly to the assault previously confessed to; however, Russell also admits that he did. ([Attorney]: [Starting the Post-*Miranda* interrogation] "you were. . . also referring to the assault that [appellant] just talked about, correct? [Russell]: Yes.")

appellant was standing outside Ross appeared calling his nephew for "two Oreo cookies" at which time appellant admitted he physically beat Ross; "I scared the shit out of him and started beating him, started whooping him." During the post-*Miranda* interrogation, despite Russell's questions about whether he used anything else to beat Ross, appellant insisted he only had used his fists, though he admitted his fists could be a "deadly weapon."

The audio recording (consistent with appellant's transcription of it in his brief) reflects that at the conclusion of the post-*Miranda* interrogation Russell asked appellant if he had any questions for him, and appellant responded that he did not.

After the hearing concluded, the court granted appellant's motion to suppress in part. The court the court struck everything from the question leading up to "I'm guilty" to the Miranda warning. The remainder of the interview was deemed admissible against appellant. Appellant subsequently entered a plea agreement and the State agreed to a sentence of twenty-five years confinement.

*Trial Court's Findings and Conclusions*

Post-appeal, on this court's request, the trial court supplied the record with its findings of fact and conclusions of law. The trial court determined that the statements at issue were made while appellant was in custody, but noted several reasons the question whether the statements were made while appellant was "in custody" was an "arguable" issue.

The court's findings indicate that it struck only the pre-*Miranda* portions following appellant's original confession. The court held appellant's pre-confession, pre-*Miranda* statements occurring from "0:00 - 1:04" of the audio record, which it concluded were statements "derived from a distinct, separate

5

criminal charge," were admissible, but held the un-mirandized portion after the defendant indicated his guilt to the investigator, from "l:05 until 2:00," was inadmissible. Finding the evidence did not imply that Russell deliberately employed a two-step interrogation and that appellant waived his *Miranda* rights and "continue[d] [to] willingly discuss his criminal activity without any signs of hesitancy or duress," the trial court found appellant's post-*Miranda* statements, "2:01 - 5:55," complied with Article 38.22 and were admissible.

## II. ISSUE AND ANALYSIS

In his sole issue, appellant complains that the trial court erred when it denied his motion to suppress his recorded statement which appellant contends was obtained through an impermissible two-step interrogation technique.

## A. Reviewing the trial court's ruling on a Motion to Suppress

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *See Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). At a motion-to-suppress hearing, the trial court is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony. *See id.* at 190. Therefore, we afford almost complete deference to the trial court in determining historical facts. *See id.*; *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). When, as here, the trial court has made express findings of fact, an appellate court views the evidence in the light most favorable to those findings and determines whether the evidence supports the fact findings. *See State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017). A trial court's ruling will be sustained if it is reasonably supported by the record and correct under any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003). However, we review de novo mixed questions of law and fact that do not rely on an evaluation of credibility and demeanor. *See id.*

**B. Law applicable to the two-step ("question first, warn later") strategy or midstream *Miranda* warnings.**

When a defendant receives midstream *Miranda* warnings in the course of making custodial statements and then later moves to suppress his post-*Miranda* statements, the threshold question for the trial court to decide is whether the interrogator deliberately employed a two-step "question first, warn later" strategy. *See Carter v. State*, 309 S.W.3d 31, 38 (Tex. Crim. App. 2010) (adopting Justice Kennedy's concurring opinion in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality)); *Foster v. State*, 579 S.W.3d 606, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (applying *Carter*). If the two-step strategy was deliberate, then the trial court must suppress any post-*Miranda* statements that were related to the substance of the pre-*Miranda* statements unless curative measures were taken before the defendant made his post-*Miranda* statements. *Carter v. State*, 309 S.W.3d at 37. If the two-step strategy was not deliberate, then the post-*Miranda* statements may be admitted if the defendant voluntarily waived his *Miranda* rights after the initial *Miranda* violation. *Id*. at 41 (citing *Oregon v. Elstad*, 470 U.S. 298, 310 (1985)).

**C. Did the investigator deliberately employ a two-step "question, first, warn later" strategy?**

We first consider the trial court's conclusion that that Russell did not deliberately employ the two-step interrogation strategy. Whether the two-step strategy was deliberate depends on the interrogator's subjective intent. *Id.* at 39. That determination often turns on the credibility of the interrogator in light of the circumstances surrounding the interrogation. *Id.* Because the trial court is in a unique position to gauge the interrogator's credibility, we, as the reviewing court, apply a highly deferential standard of review, reversing the trial court's ruling only if it amounts to a clear abuse of discretion. *Id.* at 40.

Russell's testimony at the hearing, as well as the audio recording, provided the trial court with several circumstances to consider when evaluating whether he deliberately employed a two-step "question first, warn later" strategy and ultimately supports its conclusion that Russell did not.

First, the court could consider, that despite its conclusion that appellant's statements were made pursuant to an "in-custody" interrogation, that Russell set out only to interview appellant as a witness and that Russell reasonably believed that appellant was not "in-custody" until he incriminated himself. Indeed, when asked whether he intended to "interrogate" appellant (i.e., as a suspect) or "interview" appellant (i.e., as a witness), Russell testified that his intention was to "interview" appellant. Consistently, the trial court recognized that appellant was "arguably" not in custody. The trial court's findings reflect this conclusion as to Russell's intention as the court refers to the meeting—as Russell did at the hearing—as an "interview" rather than an "interrogation."

Appellant disagrees and insists that Russell's motivation for the meeting and its manner were strategic based on the status of the investigation. Appellant points out that Russell conceded that the sole eyewitness who had once supplied police information that appellant killed Ross had recanted and the DNA tests conducted on a shovel found near Ross's body, believed to be the murder weapon, excluded appellant as a contributor. Appellant contends these facts suggest that Russell "believed appellant was his suspect," and his aim was to revive his case against him by meeting with appellant to "deliberately obtain inculpatory admissions prior to advising Appellant of his *Miranda* warning." This argument based on the diminishing certainty of the suspect in the Ross investigation is speculative, and from the same facts, one could just as easily conclude Russell only approached appellant as an eye-witness. Nothing in the record favors either competing

8

suppositions. In short, appellant asks that more be implied by these background facts than the record indicates.

Second, the record indicates that throughout the entire exchange the tone between Russell and appellant was conversational, lacking any indicia of coercion. In reviewing the audio, one could reasonably concluded the tone was conversational and appellant was eager to speak; there is even indicia that Russell is surprised or caught off guard by appellant's early interjections and sudden confession. The excluded pre-Miranda questions that followed were brief, lasted approximately one minute. Though Russell agreed at the hearing that he deliberately asked each of the follow-up questions prior to providing the *Miranda* warnings, he did not state it was his intent employ a two-step interrogation and denied that it was his intent to circumvent appellant's *Miranda* protections. The trial court could also reasonably conclude that the record of appellant's statements following the *Miranda* warning supported Russell's stated intentions, as Russell did not refer to the pre-*Miranda* questions or content in any significant manner. On this record and under the highly deferential standard applied, we cannot find that the trial court clearly abused its discretion. *See Carter*, 309 S.W.3d at 40–41 (upholding a finding that a two-step strategy was not deliberate because the exchange was conversational, lacked evidence that interrogator was hostile, aggressive or threatening or otherwise intended to create a hostile environment, and the accused was calm and cooperative).

Appellant complains that the trial court's finding that the beginning of the discussion concerned an "unrelated" aggravated assault is not supported in the record. This reference can be reasonably understood to relate to the fact that appellant was in jail on an "unrelated" aggravated assault charge. He also complains that Russell lied about the content a brief discussion before the

9

recording began, which Russell had described as ". . .some small talk. . .that was unrelated probably," but he provided no evidence, much less indisputable evidence establish that Russell lied in such a manner. *State v. Duran*, 396 S.W.3d 563, 573 (Tex. Crim. App. 2013) (stating that to reverse a trial court's finding, there must be "indisputable…evidence" that contradicts the finding)

Because the record supports the trial court's finding that the two-step strategy was not deliberate, we need not consider appellant's arguments about the effectiveness of any curative measures. *See Foster v. State*, 579 S.W.3d at 614. We consider instead whether appellant voluntarily waived his rights in his subsequent interrogation after being warned of those rights by the detective. *See id.*

## D. Did appellant voluntarily waive his *Miranda* rights?

Once a determination has been made that the pre-warning questioning was not part of a deliberate plan to undermine a suspect's *Miranda* protections, it is still necessary to determine if appellant's post-warning statements were voluntarily made. *Carter v. State*, 309 S.W.3d at 41 *citing Elstad*, 470 U.S. at 310. Thus, the factfinder must examine all of the circumstances and the course of police conduct in evaluating the voluntariness of those post-*Miranda* statements. *Id.* Appellant makes no argument concerning the trial court's implied finding that he voluntarily waived his *Miranda* protections.[3] Nevertheless, we review the record to determine

---

[3] Appellant advances no general or specific complaint that his post-*Miranda* statements were involuntary, including the complaint raised in *Foster*, that the statement was involuntary for being a continuation of pre-*Miranda* statements. In *Foster* we addressed that specific challenge with focus on particular *Elstad* factors. *Foster v. State*, 579 S.W.3d 606, 615 (Tex. App.—Houston [14th Dist.] 2019, no pet.)("The factors to be considered in *this* examination are 'the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators.'"). Our voluntariness holding in *Foster* was based in part on the absence of facts showing such continuity between the pre- and post-*Miranda* statements. *Id.* Notably, the facts of this case are significantly different with respect to those considerations—the record shows the excluded pre-*Miranda* statement and the admitted post-*Miranda* statement were not separated in time and location in any material way—both occurred together within a six-minute time-span and in the same room, both conducted by Russell. However, because these facts do not overshadow other relevant countervailing considerations demonstrating the voluntariness of the

10

if the court abused its discretion with respect to the finding.

Although the trial court made no explicit finding or conclusion as to the "voluntariness" of appellant's waiver, it described appellant's conduct throughout as "eager" to speak with Russell and found "[a]fter waiving his rights to counsel, [appellant] freely goes into greater detail as to why he assaulted the complainant on July 27, 2019." During the hearing, Russell was questioned about his confidence in appellant's *Miranda* waiver:

> Q. Okay. Did -- after you give him his rights, did he continue to be engaged in that conversation?
>
> A. Yes.
>
> Q. Did he give a voluntary statement?
>
> A. Yes.
>
> Q. Did you observe any behavior from this defendant that would alert to you that he did not give a voluntary statement?
>
> A. No.
>
> Q. Did you coerce him in order to give this statement?
>
> A. No.
>
> Q. Did you physically put your hands on him in order for him to give his statement?
>
> A. No.
>
> Q. Did you repeatedly ask him the same question in order for him to give his statement?
>
> A. No.
>
> Q. So in that interview this defendant, he actually was talking to you without you even asking questions; is that correct?
>
> A. Yes.
>
> Q. And that further -- how did you take him talking to you in this way?

---

waiver, these facts would not be determinative even had appellant raised the argument.

11

A. I felt like he wanted to speak about the incident and give an explanation for why he did what he did.

Q. Further indicating to you that this was a voluntary statement?

A. Correct.

The record shows Russell testified that after waiving his *Miranda* warnings, appellant's demeanor remained the same and that appellant was eager to tell his side of the story. The audio record reflects that appellant remained calm and cooperative, that the post-*Miranda* interrogation remained conversational, that Russell never sounded hostile, aggressive, or threatening towards appellant. Based on the totality of the circumstances, the record supports the trial court's finding that appellant voluntarily waived his rights under *Miranda*. *See Gutierrez v. State*, 221 S.W.3d 680, 688 (Tex. Crim. App. 2007) (finding post-*Miranda* statement admissible where (1) defendant was cooperative, (2) the interaction was never confrontational, and (3) no threats were ever made).

### III. CONCLUSION

Having overruled appellant's sole issue, the trial court's judgment is affirmed.

/s/     Randy Wilson
Justice

Panel consists of Chief Justice Christopher and Justices Zimmerer and Wilson.

Do not publish — TEX. R. APP. P. 47.2(b).